**MOTTER, Collector of Internal Revenue, v. SMYTH.**

**No. 1119.**

Circuit Court of Appeals, Tenth Circuit.

April 17, 1935.

F. W. Dewart, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., Sewall Key, John MacC. Hudson, and E. F. McMahon, Sp. Assts. to Atty. Gen., and Summerfield S. Alexander, U. S. Atty., of Topeka, Kan., on the brief), for appellant.

Claude I. Depew, of Wichita, Kan. (W. E. Stanley and William C. Hook, both of Wichita, Kan., and Charles P. Swindler, of Washington, D. C., on the brief), for appellee.

Before LEWIS and PHILLIPS, Circuit Judges, and KENNEDY, District Judge.

KENNEDY, District Judge.

In 1928, Charles H. Smyth made his income tax return for the calendar year upon which the ascertained tax was paid in due course. Thereafter, the Internal Revenue Bureau determined that the taxpayer was liable for an additional tax in the sum of some $29,000. The taxpayer paid the amount under protest to the collector and filed a claim for refund, which claim was determined adversely to the taxpayer. Thereupon he instituted a suit against the collector for the recovery of the alleged erroneous tax. During the pendency of the litigation the taxpayer died, and under an order of revivor his executrix was substituted in his stead. In the court below in a jury-waived trial, the issues were determined in favor of the taxpayer, and from the findings and judgment the collector appeals.

The cause of action involves three items by which the income of the taxpayer would be increased for the taxable year 1928. These items are as follows:

"(a) $33,150.00 commission received on sale of securities of the Kansas City, Mexico & Orient Railroad Company to the Atchison, Topeka & Santa Fé Ry. Co.

"(b) $66,580.82 unreported profit on the sale of stock owned by taxpayer in the Kansas City, Mexico & Orient Railroad Company.

"(c) $28,572.00, representing notes of one Jerome Harrington, which were deducted by taxpayer from his income in 1928 as bad debts and which deduction was disallowed by the Commissioner."

A brief sketch of the facts upon which the controversy rests is as follows: Charles H. Smyth was the owner of 395 shares of the capital stock of the Kansas City, Mexico & Orient Railroad Company. This carrier had been from the beginning of its service in financial difficulties, but in 1927 there developed a prospect that it might be taken over by the Santa Fé Railway System, a solvent and going concern. Charles F. Smyth, the son of Charles H., the taxpayer, in 1927 contacted a high official of the Santa Fé System and induced him to go to the hunting camp of his father, Charles H. Smyth. In the conversation which took place, it developed that negotiations might be opened up looking to the taking over of the Orient by the Santa Fé. Some time in January, 1928, the two Smyths, father and

son, got together and decided to attempt to put over a sale to the Santa Fé of the controlling stock in the Orient. It was agreed between father and son that they would jointly attempt this enterprise, and that in the event of its consummation there should be an equal division of the profits arising by commissions from the purchase and sale of the stock of the Orient, the controlling interest of which was held by English stockholders, and likewise an equal division of the profits which would accrue over and above the amount which Smyth had invested in the 395 shares held by him personally. It was further agreed that the father would contact the stockholders and also the officials of the Santa Fé, and that the son would take care of the office, collect and supply data concerning the Orient road in its operations as should be required by the prospective purchasers. On account of the nature of the enterprise, it was necessary to keep the plans and negotiations more or less secret, and the son was to do and did do all of the necessary office work without the aid of a stenographer. The enterprise was fully consummated and the profits therefrom were divided equally between the father and son. In specific amounts, one-half of the profits realized by the sale of the Orient stock secured from the English stockholders was $33,150, and one-half of the profit on the sale of the stock owned by the father, Charles H. Smyth, was $65,-580.82. These amounts the father accounted for in his income tax return and the other half of such profits were received by the son. The Revenue Department, in reassessing the tax, charged the father as income of his own with the total commissions and all the profits on the sale of his own stock. The remaining item in controversy, $28,572, is a deduction by Charles H. Smyth from his income in 1928, in the nature of a charge-off for bad debts, represented by notes of one Jerome Harrington, a son-in-law of the taxpayer, which item was disallowed by the Commissioner. Charles H. Smyth in November, 1923, loaned Harrington $15,072, and in January, 1924, $13,500, taking the notes of Harrington. The money realized from the loan was used to buy an interest in the Fourth National Bank of Wichita, with which Harrington was connected; the stock purchased being pledged as collateral for the loan. The bank subsequently was unsuccessful and the debt remained an open and accrued obligation until in September, 1928, when it was charged off by Smyth. After the failure of the bank in September,

1924, Harrington went to El Paso, Tex., for his health, and was employed there by one Denton. Through the assistance of Denton and advancement of money by him, Harrington negotiated a compromise settlement with some of his creditors upon the basis of 7 per cent. of their claims. Among the claims so settled were obligations from Harrington to Charles H. Smyth represented by other and older notes than those given for the purchase of the bank stock, and a 93 per cent. deduction was made by Smyth in his appropriate income tax returns. Harrington repeatedly stated that in the future he would pay the notes which are the basis of the controversy here. Some time in 1927, through the assistance of Denton, Harrington succeeded through money advanced by Denton in purchasing the assets of two liquidating National Banks in Cheyenne, Wyo. Harrington engaged in this new enterprise, but after realizing sufficient to repay his sponsor for the purchase price advanced, his health failed and it became necessary for him to go to California. While Harrington was in California during the latter part of the year 1928, Charles H. Smyth visited him there and found that his health was gone and that he would never be able to work again. While on his way to consult a specialist in May, 1929, Harrington died in Chicago. When Smyth ascertained the complete failure of Harrington's health in 1928, and it became apparent that he would never be able to engage in any business again, Smyth abandoned all hope of collecting the notes and charged them off.

The questions presented are: (1) Whether the two items representing one-half of the profits as commissions from the sale of stock in the Orient road and one-half the profits from the sale of Smyth's own stock were properly allocated to Charles H. Smyth as income for the year 1928; and (2) whether the notes of Harrington were properly disallowed to the taxpayer as a charge-off for bad debts.

It is the contention of the appellee that the enterprise between father and son concerning the Orient stock, including that held by the father, was a joint adventure in which the profits were properly divided equally between them; while the appellant contends that the facts do not establish a joint adventure, but that on account of the inconsequential services performed by the son they amounted to no more than clerical aid and consequently the entire profit accrued to the father. There is no fraud

charged or averred in connection with the transaction.

In Bowmaster v. Carroll, 23 F.(2d) 825, at page 827 (C. C. A. 10), Judge Phillips, speaking for the court, says: "A joint adventure has been defined as follows: 'A special combination of two or more persons, where, in some specific venture, a profit is jointly sought, without actual partnership or corporate designation.' 33 C. J. 841; Perry v. Morrison, 118 Okl. 212, 247 P. 1004, 1006; Griffin v. Reilly (Tex. Civ. App.) 275 S. W. 242, 246."

In Champlin v. Commissioner, 71 F.(2d) 23, at page 26 (C. C. A. 10), the matter of an alleged joint enterprise between husband and wife was considered, and Judge McDermott uses the following language: "The error in the conclusion of the Board of Tax Appeals, as we conceive it, is this: Having found, as a matter of law, that the testimony did not establish a general trading partnership, the Board concludes that the profits from the enterprise belonged to her husband and not herself. The conclusion does not follow. If she were a tenant-in-common, a joint-adventurer, or a mining partner, the profits would still be hers and not his. A share-cropper is not a general partner; yet the landlord cannot be compelled to pay taxes on the tenant's share of the crop. The petitioner must prevail if the proof conclusively shows these profits were not his, and it is not material whether the relationship is a general partnership, a mining partnership, or a joint-tenancy."

In Botsford v. Van Riper, 33 Nev. 156, 110 P. 705, 711, the court says: "As before stated, the mere mutual promise of the parties furthering and rendering their aid, advices, and suggestions, if agreed to was sufficient consideration to support the contract under joint adventure; but the law is well established that the furnishing of capital by the parties to a joint adventure is not necessary to the validity of the contract, so long as the original agreement on which the contract was entered into was carried out. Boqua v. Marshall, 88 Ark. 373, 114 S. W. 714; Van Tine v. Hilands (C. C.) 131 F. 124."

In Griffin v. Reilly (Tex. Civ. App.) 275 S. W. 242, at page 246, the following language appears: "As we understand the relation of joint adventurers, it is not necessary for the relation to exist before the property with which the parties are to operate is purchased, but that the relation may be created with reference to property already owned by one of them, and in which the other obtains an interest with the intention of selling or using the same for profit."

Other supporting authorities are Crawford v. Forrester, 108 Kan. 222, 194 P. 635; Osborn v. Commissioner, 22 B. T. A. 935. When the general construction as to the substance of a joint adventure is examined and analyzed, in which the foregoing authorities are a sample of the many, we believe that the rule has been fully satisfied in the case at bar so as to bring the arrangement between father and son within the scope of a true joint adventure. It is not necessary that parties to the arrangement furnish capital or services in equal amount, nor does it destroy the validity of the arrangement that one should contribute property previously acquired. Even on the basis of an equitable division of time and effort contributed in this case, who can say that the son in addition to his clerical services did not expend time and labor in excess of that spent by the father when he presumed to and did collect data concerning the Orient Railroad and its operations involving the history of the territory which it served? It follows that the son was entitled to one-half the profits accruing as commissions from the handling of the stock from the English stockholders, and also the same division of profits accruing from the sale of the father's stock. The trial court properly determined that these profits paid to the son were not chargeable to the father as income.

As to the remaining item representing the disallowance of a charge-off for bad debts, we think the judgment of the trial court was equally sound. Speaking to the subject here under consideration, the court in Selden v. Heiner, 12 F.(2d) 474, at page 477 (D. C. Pa.), makes this simple but logical analysis: "The statute contemplates a situation with which the taxpayer is confronted, and certainly he is made, in the first instance, judge of the worthless character of the debt. When he, in good faith, believes that the legal situation of the debt is such, considering all the surrounding and attendant circumstances, that the debt is not in fact recoverable, and that legal action to enforce payment would in all probability not result in obtaining any substantial part of the debt, although there might be a remote possibility that a small part thereof might ultimately be recovered, in this situation,

he is justified in treating the debt as worthless and charging the same off on his books."

Every element which ordinarily would go to the determination of the fact as to whether or not a debt at the time is ascertained to be uncollectible and worthless is present, under the stipulated facts in this case. It clearly does not appear that the taxpayer should have charged the debt off at a time before he actually ascertained that it was uncollectible on account of the lost and irrecoverable health of the debtor.

The judgment of the trial court is affirmed.