**SILVERMAN v. OSBORNE REGISTER CO.**

No. 9185.

United States Court of Appeals
District of Columbia.

Argued May 23, 1946.

Decided June 20, 1946.

Mr. David G. Bress, of Washington, D. C., with whom Messrs. Alvin L. Newmyer and James P. Donovan, both of Washington, D.C., were on the brief, for appellant.

Mr. Gerhard A. Gesell, of Washington, D.C., with whom Mr. Spencer Gordon and Miss Eleanor Sessoms, both of Washington, D.C., were on the brief, for appellee.

Before GRONER, Chief Justice, and CLARK and PRETTYMAN, Associate Justices.

CLARK, Associate Justice.

This is an appeal from a summary judgment for Osborne Register Company, defendant below, appellee here. Appellant Silverman's complaint was founded on an alleged breach of contract and prayed for recovery in the amount of $280,000.

The facts come to us in the complaint and in Silverman's deposition and affidavit. It appears that Silverman, doing business as Broadcast Specialties Company, was a "middle man" in supplying inexpensive, mass produced, radio premiums, patriotic buttons, token awards, etc. Typical of the sort of thing he dealt in was the Red Cross Blood Donor Button. He owned no manufacturing facilities, and his modus operandi was to seek out the potential buyers and thereafter arrange with various manufacturers and intermediate fabricators for a finished product that was suitable to the customer. By his own admission he customarily took a handsome profit for these services.

When Silverman learned that the Office of Price Administration was considering a ration token program he became actively interested in it. He appears to have devoted considerable time and effort in talking with various government officials about materials, size, design, and other details of the proposed token. Having previously done business with Osborne Register, he asked that concern, through one Wiley Osborne, an owner, to make up some sample tokens and to give him a price on them. With these he approached OPA officials only to find that so far as the ration token business was concerned, the contract would have to be let to, and performed by, a manufacturer.

With this information, he called Osborne and explained, "I better go out and get myself a factory, or else a manufacturer to do the bidding for me." It is at this point that Osborne is alleged to have entered into a binding contract with Silverman by telling him that he need not seek a factory, or someone else to do his bidding, but

rather, if the government were interested in the sample Osborne product shown by Silverman, all that was necessary was for Silverman to state how much the price quoted should be raised in the bid to the government. To this Silverman said, "15% above the price you quote me in your letter of August 20th." Thereafter it seems that Silverman and Osborne had some correspondence on the subject, and later, through Silverman, an OPA man was taken to see the Osborne Register plant in Cincinnati, and at that time materials were discussed with a fiber supplier. From that point forward Silverman was eased out of the deal. Osborne commenced direct negotiations with OPA people. Silverman was not present at the bid opening, and it was not until the following day that he learned that Osborne had secured the contract. He learned at the same time that Osborne had no intention of allowing him 15% of the contract. Confronted with this state of affairs he went to find a lawyer.

On these facts, all supplied by him, appellant asks us to hold that the trial court erred in finding, (a) that there was no real issue of fact, and that therefore a Motion for Summary Judgment would lie; and (b) that the general principle laid down in Providence Tool Co. v. Norris, 2 Wall. 45, 54, 17 L.Ed. 868,[1] is applicable. No real issue of fact appears, and we think the trial court correctly applied the underlying principle of the Tool Co. case, and quite rightly disposed of the litigation with a memorandum opinion pointing out:

"The tendency of such an agreement as we have here, apart from other consideration, was to have the government pay fifteen percent more than it would presumably have paid under the circumstances. Such a contract is illegal and void on the ground of public policy and as a consequence the courts have no alternative in such a situation but to so declare it. True, the defendant reaps the benefit, but courts cannot be concerned with that aspect of such matters, for reasons that are obvious and have been expressed judicially time and again. They, therefore, leave the parties where they find them."

Taking everything before us in the light most favorable to appellant, we think nothing more is shown than a bargain that was illegal at its inception, and hence void and unenforceable. No doubt diligent effort was expended in its furtherance but this will not substitute for its fatally defective heart.

The fact that the appellee is apparently in pari delicto by charging exorbitant profits does not enter into the determination of this case. The law provides methods by which the Government can protect or recoup itself and doubtless, if necessary, these will be availed of by the government. But this has nothing to do with the contentions between the parties here.

We do not think that appellant's ingenious and exhaustive arguments require elaborate answers. It would be a travesty on the term to dignify this bargain by calling it a "joint venture." Silverman thought he had a sure thing, admittedly at the government's expense, and without risk to him.[2]

---

[1] The Court here said: "Can an agreement for compensation to procure a contract from the Government to furnish its supplies be enforced by the courts? We have no hesitation in answering the question in the negative. All contracts for supplies should be made with those, and with those only, who will execute them most faithfully, and at the least expense to the Government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the Government. No other consideration can lawfully enter into the transaction, so far as the Government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the transaction, is against public policy. That agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation, and personal influence, as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds."

[2] Cf. the fact situations in illustrative cases cited by appellant. Kasishke v. Baker, 10 Cir., 146 F.2d 113, 115, certiorari denied 325 U.S. 856, 65 S.Ct. 1185, 89 L.Ed. 1976 (where the "profit and loss" standard is cited); Aiken Mills v.

In the circumstances of this case Silverman cannot qualify as a "salesman" in the sense referred to in cases cited in his behalf on this appeal.[3] As things worked out in the instant case, the party who in fact had something to sell, sold it, perhaps, for all we know, at a price that embraced the other's so-called "commission", and then refused to pay off.

The trial judge properly concluded that the courts will not lend themselves as forums for the settlement of controversies so patently against public policy.

Affirmed.

United States, D.C., 144 F.2d 23; Motter v. Smyth, 10 Cir., 77 F.2d 77; In re Asiatic Exploration, D.C., 41 F.2d 230; Dexter & Carpenter v. Houston, 4 Cir., 20 F.2d 647.

[3] See Oscanyan v. Winchester Repeating Arms Co., 103 U.S. 261, 26 L.Ed. 539; J. E. Hanger, Inc., v. Fitzsimmons, 50 App.D.C. 384, 273 F. 348.