F. J. Buckley and E. H. Buckley Trading as F. J. Buckley and Company, Appellants, v. Coyne Electrical School, Inc., Appellee.

Gen. No. 45,259.

NIEMEYER, P. J., specially dissenting.

Opinion filed June 1, 1951. Rehearing denied June 13, 1951. Released for publication June 22, 1951.

DEFREES, FISKE, O'BRIEN & THOMSON, of Chicago, for appellants; VINCENT O'BRIEN, THOMAS J. JOHNSON, JR., and ROGER D. SWETT, all of Chicago, of counsel.

WALKER, ATWOOD, ZUKOWSKI & MCFARLAND, and URBAN A. LAVERY, all of Chicago, for appellee; PETER B. ATWOOD, and URBAN A. LAVERY, both of Chicago, of counsel.

MR. JUSTICE FEINBERG delivered the opinion of the court.

Plaintiffs filed this action for an accounting against defendant for commissions allegedly due them under a contract of employment with defendant, by which plaintiffs were to negotiate and secure government contracts for technical training of those in the armed services at defendant's school, and to be paid a certain compensation per man-hour, covered by the number of men and period of time fixed by such contracts with the government. There was a limited reference to a master to determine and report his findings of fact and conclusions of law as to whether a contract existed between the parties under which plaintiffs would be entitled to an accounting. After prolonged hearings before the master, and over 2,000 pages of testimony taken and about 200 exhibits introduced in evidence, the master made his report, containing 41 findings of fact. His conclusions of law were that the contract in question was not void as against public policy; that it did not violate government regulation 9001 which provided:

"Every contract entered into pursuant to this order shall contain a warranty by the contractor in substantially the following terms:

"The contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to annul the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business";

that plaintiffs are entitled to an accounting, and recommended a decree accordingly. His finding No. 34 was as follows:

"It was not contemplated by the parties that political influence, personal influence, chicanery or bribery were to be used by plaintiffs in procuring for defendant contracts with the Government nor in fact was political influence, personal influence, chicanery or bribery used by plaintiffs in securing such contracts."

To this report defendant filed objections, and upon a hearing the chancellor sustained the objections as to some of the findings of fact and conclusions of law and overruled the objections as to others. As to finding of fact No. 34, the words "chicanery" and "bribery" were stricken; otherwise the finding was sustained in the decree.

The chancellor heard no evidence and based his decree upon the record made before the master. The decree made the following specific findings:

"A. That an agreement concerning 800 students was entered into between Plaintiffs and Defendant as found in the Master's Report.

"B. That no express agreement concerning any students other than the said 800 was entered into by Plaintiffs and Defendant in that they did not agree as to the terms of the compensation to be paid Plaintiffs, but that Plaintiffs performed services in relation to said other students at the request and for the benefit of Defendant.

"C. That the express agreement set forth in 3A above and the implied agreement set forth in 3B above is illegal and void as against public policy in that it involves the payment of contingent fees for securing war contracts with the Federal Government."

The decree dismissed the complaint for want of equity, from which decree plaintiffs appeal.

The record establishes the following essential facts out of which this controversy arose: Plaintiffs, husband and wife, doing business as F. J. Buckley and Company, engaged in the real estate brokerage and insurance business in New York City and later in Los Angeles, California, and in the latter city conducted a large volume of business in real estate and insurance, and oil and gas leases; that in 1939, F. J. Buckley became identified as an officer and director of an aircraft company that required his spending considerable time in Washington, D. C., developing considerable business contacts with governmental agencies and acquiring considerable knowledge as to the methods employed by these governmental agencies, involving supply of materials and services; that in the early part of 1942, National Schools, conducting vocational schools in Los Angeles, California, employed him as its agent to negotiate contracts with the government for the training of military personnel and to assist in servicing such contracts, at a compensation to him of five cents per man-hour of training given government trainees by the school; that he was successful in securing several contracts with the government for this school; that he also was engaged by the Delehanty School of New York, the Electronics and Television Institute of Omaha, the American Television Laboratories of Chicago, and Midwest Motive Trades of Bloomington and Danville, Illinois; that Harold C. Lewis was the president and managing head of defendant's school, in existence in Chicago since 1912, until his death in 1946; that Bennett Cooke was vice president, director and owner of one-half of the school's stock; that the school had a main building, containing 60,000 square feet, as well as an annex; that both buildings were equipped with classrooms, workrooms, apparatus and equipment

necessary for the instruction of such trainees; that upon the death of Lewis, Cooke succeeded him as president.

It appears that in December 1941, the War Department circularized the various schools of the country, including defendant's school, requesting information as to the facilities for technical instruction and training; that about March 9, 1942, without any solicitation by Buckley, defendant's superintendent, Richards, telegraphed Buckley requesting an appointment, and by subsequent appointment, Lewis and Richards met Buckley on March 11 in Washington; that it was their first meeting with Buckley; that they made known to him their desire to secure government training contracts, and detailed to Buckley their unsuccessful experience in their efforts to negotiate such contracts, and inquired if Buckley could help them; that Lewis said that his health would not permit him to make frequent trips to Washington; that defendant was losing many of its civilian students and was anxious to secure government contracts; that Buckley informed them of his background and experience, and suggested that he was in a position to act for them; that the price for his services was discussed, and it was agreed that Buckley was to act as defendant's Washington representative for a period of one year and at his own expense negotiate and procure government contracts for defendant; that he was to be paid five cents per man-hour upon all contracts, or renewals or extensions thereof, providing for a rate of thirty-five cents per man-hour or higher for trainees, and that Buckley could continue to represent other schools; that this arrangement, so verbally made, was confirmed in writing by Lewis, with the condition that all contracts negotiated for training at defendant's school would first be approved by Lewis; that Buckley thereupon began his service for defendant, exerted considerable

425

effort and performed considerable services in a preliminary way for the negotiation of contracts with the government for defendant; that Buckley familiarized himself with all of the facilities and equipment of defendant; that he had prepared pictorial booklets and pamphlets containing data and distributed them among the various branches of the armed services interested in training in private vocational schools; that he secured books, manuals and other data concerning governmental training in radio subjects and furnished them to defendant; that he visited a great number of schools located in different cities and familiarized himself with the methods of teaching and handling and housing the trainees, and reported his findings to the defendant; that he assisted Lewis and Richards in working out time schedules for arrivals of trainees at defendant's school to accommodate the maximum number the space, equipment and teaching personnel could take care of in defendant's school and that would meet the approval of the government; that he assisted defendant in securing priorities for equipment as well as for the needed addition to the school building; that when defendant had complaints from the government as to lack of discipline and crowded conditions among the trainees in defendant's school, he was entrusted with the duty of taking care of the complaints; that he assisted in expediting payments by the government on the training contracts with defendant; that the rate of pay to Buckley was modified about March 21, 1942, when defendant ascertained that the government pay would be twenty-seven cents per man-hour of training for radio operators and thirty-two cents per man-hour of training for radio mechanics; that Buckley's commission was accordingly reduced to two cents per man-hour for training radio operators and three and one-half cents per man-hour for training radio mechanics; that this modification was evidenced in writing

by a letter from Lewis; that some contracts, of which Buckley was not aware at the time, were awarded by the government to the defendant for personnel training, which Buckley claims were the result of his efforts and for which plaintiffs claim commissions; that on March 28, 1942, Lewis wrote to Buckley, complaining about his absence from a conference and stating:

"If it was your intention that I was to do all the work after you formally met them, then I must be thinking of getting someone to represent me, for I cannot give all my time to this";

that on May 19, 1942, defendant paid plaintiffs $563.12 on account of commissions due plaintiffs under the contract of employment, and on June 19, 1942, defendant paid plaintiffs $2,000 on account, and again on July 9, 1942, an additional $2,000 was paid; that on June 4, 1942, Lewis wrote to Buckley that he had been advised by his lawyer about payment of commissions to agents, and that the government might disallow all deductions for payments made, and that he would advise him later after another conference with his lawyer; that a postscript to the letter read:

"P. S. It is not me. I am satisfied but will Govt. be";

that finally on September 17, 1942, Lewis, by letter to the government and by letter to Buckley, terminated the employment of Buckley as agent.

It is for commissions claimed to be due to plaintiffs upon contracts between the government and the defendant that the accounting is sought.

The decree, having found that the contract in question was illegal and void as against public policy because it involved the payment of contingent fees for seeking war contracts with the Federal government, necessarily presents the following questions for consideration: (1) Is such a contract void in the absence

of any evidence that the parties contemplated the use of influence or employment of means contrary to public policy to secure such contracts from the government? (2) Does the contract violate government regulation 9001? (3) Does the evidence clearly bring plaintiffs within the exception in regulation 9001? We shall discuss these questions in the order stated.

The rule of law in this State, as well as in nearly all other jurisdictions, was stated in *Lewy v. Standard Plunger Elevator Co.,* 296 Ill. 295:

"There can be no question that a contract based upon an illegal or immoral consideration is unenforceable and that a contract to perform services which would tend necessarily to improperly influence action as to public contracts or the administration of justice is also unenforceable."

Finding No. 34 of the master, which was sustained by the decree below, adjudicates the fact that it was not contemplated by the parties that political or personal influence was to be used by plaintiffs in procuring for defendant contracts with the government, and that in fact political or personal influence was not used by plaintiffs in securing such contracts. In view of the finding by the master, amply supported by the evidence and approved by the decree, the rule of law stated is not applicable to the instant case. The instant contract did not violate government regulation 9001.

In *Ebeling v. Fred J. Swaine Mfg. Co.,* 357 Mo. 549, 209 S. W. (2d) 892, 895, the Supreme Court of Missouri, dealing with the government regulation in question, said:

"Looking to the facts of the instant case, Executive Order No. 9001 did not prohibit the employment of agents to procure war contracts on a percentage commission basis. Muschany v. United States, 324 U. S. 49, 61–66, 65 S. Ct. 442, 80 L. Ed., 744. It merely pro-

428

vided that the contract should contain a warranty that the contractor would not employ other than a bona fide, established commercial or selling agency to obtain the contracts. Neither did it say the contract should be void if the warranty were violated. It merely reserved to the Government the option to annul the contract, or to deduct the commission of the spurious agent —which latter provision would recognize the contract as still existent and affect only the price, or cost, of the work."

In *Reynolds v. Goodwin-Hill Corp.*, 154 F. (2d) 553, where the regulation in question was under consideration and a recovery sustained for contingent fees, the court, speaking through Justice Learned Hand, said:

"Even though we assume for argument that the contract here in suit would be illegal under the decisions which we mentioned at the outset—a point we do not decide—this appeal turns upon whether the regulation just mentioned absolved it. We think that it did. In obtaining its supplies the War Department was free to impose upon bidders such conditions as it thought necessary in the national defence; and it need impose no more than it thought necessary. Even though the law made all contingent fees illegal, it might believe that production would be speeded, if some kinds of contingent fees were allowed, and it might so provide by its regulations. If it did so provide, not only would the contracts between itself and contractors be legal, but any taint would be removed from contracts between the contractors and their agents. This is plain, because by hypothesis the vice of the practice was in fostering deviation from their loyalty by officials of the Department; and if the Department was content to accept that risk, that necessarily presupposed that the risk might be actually imposed. Muschany v. United States, 324 U. S. 49, 65 S. Ct. 442. Thus, the

■■■■■■■■■■■■■■■■

case turns upon whether the plaintiff was the kind of agent whom § 81.323 allowed contractors to engage upon a contingent fee.''

In *Valdes v. Larrinaga,* 233 U. S. 705, which upheld a judgment for plaintiff based on a contingent fee contract, Mr. Justice Holmes, distinguishing his previous decision in *Hazelton v. Sheckels,* 202 U. S. 71, said:

''But we discover nothing in the language of the letters that necessarily imports, or even persuasively suggests any improper intent or dangerous tendency.''

In *Bradford v. Durkee Marine Products Corp.,* 180 Misc. 1049, 40 N. Y. S. (2d) 448, the court, dealing with regulation 9001, said:

''The requirement of a warranty that the person who contracts with the Government has not employed anyone to procure the contract upon an agreement for a commission perhaps may be regarded as a prohibition against such employment, but the penalties for violation of such assumed prohibition are specifically designated, and one of them is in effect a recognition of the validity of the contract, viz., the provision that the Government may deduct the amount of the commission from the contract price. The order does not expressly provide that a contractor's agreement to pay commissions is void or voidable or unenforceable, and no such provision should be read into it. *Sajor v. Ampol, Inc.,* 275 N. Y. 125, 130, 131, 9 N. E. 2d 803; *Fosdick v. Investors' Syndicate,* 266 N. Y. 130, 194 N. E. 58; *Dunlop v. Mercer,* 8 Cir., 156 F. 545, 555; *Frits v. Palmer,* 132 U. S. 282, 289, 10 S. Ct. 93, 33 L. Ed. 317.''

To the same effect is *Singer v. Bruner-Ritter, Inc.,* 180 Misc. 928, 42 N. Y. S. (2d) 881, affirmed 44 N. Y. S. (2d) 589. Likewise, *Leahy v. Brooklyn Waterfront Terminal Corp.* (N. Y.), 69 N. Y. S. (2d) 596.

■ We agree with the reasoning in the cases cited and agree with the master that the instant contract is not against public policy.

■ We are convinced by the evidence in this record that plaintiffs come within the exception contained in the regulation. The nature of their business; the extent of their efforts, not only on behalf of defendant but others as well; their ability developed in the field, which would qualify them upon merit to secure contracts for the defendant, not limited to one contract alone; and being free from the taint or suspicion of intent to employ improper influence in securing such contracts, as found by the master and approved by the chancellor, make it clear to us that the exception in the regulation applies to the plaintiffs and the contract in question. *Reynolds v. Goodwin-Hill Corp., Ebeling v. Fred J. Swaine Mfg. Co., Bradford v. Durkee Marine Products Corp., Singer v. Bruner-Ritter, Inc.,* and *Leahy v. Brooklyn Waterfront Terminal Corp., supra.*

■■ We are persuaded that the evidence sustains the master's findings and conclusions, and the chancellor having heard no other evidence than that contained in the report of the master, the rule stated in *Kosakowski v. Bagdon,* 369 Ill. 252, 258, would govern. It was there said:

"The chancellor, in this case, had no better opportunity to judge the credibility of witnesses than has this court on appeal, and all the facts are open for our consideration."

The decree of the superior court is reversed and the cause remanded with directions to enter a decree for accounting in accordance with the findings and conclusions of the master.

*Reversed and remanded with directions.*

TUOHY, J., concurs.

NIEMEYER, P. J., dissents.

431

NIEMEYER, P. J., dissents.

Plaintiff was a Signal Corps officer in World War I. On leaving the army he engaged in industrial engineering and the real estate business in New York City until the fall of 1922. He then returned to his native city of Los Angeles where he conducted a real estate and insurance business with his wife under the name of F. J. Buckley and Company. This company also negotiated leases on oil lands. Mrs. Buckley did office work. In 1939 Buckley became an officer and promoter of the Los Angeles Aircraft Corporation. So far as the record shows, the company never got into production. Buckley, however, spent considerable time in 1939, 1940 and 1941 in Washington, D. C., in an unsuccessful attempt to obtain government financing for the corporation. He did not receive any salary or commission for his services. In September 1941 he returned to Washington to begin his activities in the school field—soliciting training contracts from the government on a commission basis. He says that his first contract was with the Hemphill schools. This contract was not signed until March 19, 1942. It was terminated in May. He did not obtain any students for them. In January 1942 he began soliciting contracts for the National Schools. By March 11, 1942, when his transactions with defendant commenced, he had procured one contract. During his connection with defendant he "only represented Coyne and National." Until June 1942 he had no office in Washington other than his room in the Army and Navy Club, where he received mail and from which he sent communications on letterheads of the club. The contracts with the Hemphill schools and defendant were undertakings of Buckley individually. The first contract with the National Schools is not before us.

On March 4, 1942 defendant accepted the government's proposal to train 200 radio mechanics for 25 cents per man-hour of instruction, the price previously quoted for training radio operators and mechanics. On March 11th, at a conference with Lewis, president of defendant, and Richards, his assistant, at the Army and Navy Club, Buckley agreed to act as defendant's agent in procuring training contracts from the government for a contingent fee of 5 cents per hour per man on all contracts at 35 cents or more per hour. No contracts at 35 cents or more per hour were obtained. Lewis increased his prices to 27 cents per man-hour of instruction for radio operators and 32 cents for radio mechanics, and subsequent contracts were awarded on that basis. Buckley testified that Lewis offered him on such contracts one-half ($3\frac{1}{2}$ cents) of the increase for instructing mechanics and 2 cents for operators. Lewis and Richards died prior to the hearing before the master.

March 29th, at Los Angeles, Buckley first learned of Executive Order 9001. After consultation with his lawyer he wrote Lewis March 30th suggesting that a letter he had typed March 21st for Lewis' signature, but which Lewis had not signed, purporting to state the terms of his agreement with defendant, be rewritten and a paragraph inserted stating that Buckley's organization was not founded on political or other influence but on Buckley's ability as a capable, successful business sales executive. In early June, Lewis called Buckley's attention to an article in the United States News of June 5th on payment to lobbyists and agents, and expressed his fear that the government would regard the payments to Buckley (approximately eleven and seven per cent of the gross tuition received) as excessive and refuse to allow them as a deductible expense. Buckley replied that he knew of the investigation going on in Congress over the payment of con-

tingent fees and had attended a number of the hearings. On August 5th, because he ''knew of the senate and congressional hearings in Washington relating to agents,'' Buckley presented a substitute agreement to Lewis. This proposed agreement was dated March 12, 1942, and was between defendant and Buckley and Company instead of Buckley individually. About the same time he procured from National Schools an agreement between them and Buckley and Company dated February 1, 1942 to take the place of the contract providing for payment to him of 5 cents per man-hour of instruction. These contracts—the new one with National Schools and the proposed agreement with defendant—recited that Buckley and Company was a ''bona fide established sales and service agency'' and ''functions solely as a capable, experienced and ethical commercial organization.'' Each provided for compensation payable monthly for maintaining a Washington office for the school and for a percentage of the gross tuition received, instead of so much per man-hour of instruction as in the former agreement. The proposed agreement with defendant extended the activities of the agent from procuring government contracts to the making of contacts with individuals, organizations and governmental authorities. Defendant refused to accept the new agreement and a revised form of agreement submitted August 26th. On that day a conference was had between Buckley, Lewis, and his lawyer Atwood, at which Buckley's ability to qualify under Executive Order 9001 was discussed. Buckley and Atwood are not in complete agreement as to what transpired at the conference. Atwood testified that he told Buckley that he could not bring himself within the exception of the executive order, and that he, Atwood, then directed Lewis not to make further payments. Buckley disputes this testimony. He does not contradict Atwood's statement that he, Buckley, said he had not been connected

with soliciting business from the government before the war. No further payments were made to Buckley. September 2nd Buckley told Lewis there was a bill under consideration that contemplated prohibiting any agent from receiving a commission for procuring contracts; that his Washington attorneys had suggested they could probably work out a basis for a monthly salary for procuring, and use a commission basis for the large volume of work in servicing the contracts. On September 17th, after correspondence between the attorneys for plaintiff and defendant, defendant advised the Signal Corps that Buckley no longer represented it and all contractual relations between Buckley and defendant were terminated. This suit followed. Buckley testified that between $160,000 and $190,000 is due him as commissions. The suit, however, is by Buckley and his wife, doing business as F. J. Buckley and Company. Right of action, if any, against defendant is in Buckley, individually, and not in himself and his wife. He will be referred to hereafter as the plaintiff.

Contracts to pay compensation contingent upon success in obtaining orders or business from the government are void, being contrary to sound morals and public policy. Their vice is in their corrupting tendency, and it is immaterial whether the parties contemplated or used improper influence or other illegal or corrupt means to accomplish the end desired. In *Crichfield v. Bermudez Asphalt Paving Co.*, 174 Ill. 466, a contract for the payment of compensation for procuring paving contracts from the city was declared void, the court saying:

"It makes no difference whether the parties were actually guilty of bribery and corruption under the contract or not. *If the performance of the obligations imposed by the contract has an evil tendency or fur-*

*nishes a temptation to use improper means, the contract is illegal and contra bonos mores."* (Italics supplied.)

In *Lewy v. Standard Elevator Co.*, 296 Ill. 295, the court said:

"There can be no question that . . . a contract to perform services which would *tend necessarily to improperly influence action as to public contracts* or the administration of justice is also unenforceable. (*Tool Co. v. Norris*, 69 U. S. 45; *Goodrich v. Tenney*, 144 Ill. 422; *Crichfield v. Bermudez Asphalt Paving Co.* 174 id. 466.)" (Italics supplied.)

*Tool Co. v. Norris, supra* (1864), like the case before us, involved the right to recover commissions for procuring a war contract—the sale of muskets to the United States during the Civil War. We quote at length from the opinion:

"Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the Government. No other consideration can lawfully enter into the transaction, so far as the Government is concerned. Such is the rule of public policy; and *whatever tends to introduce any other elements into the transaction, is against public policy*. That agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation, and personal influence, as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds.

". . . It (the principle) has been asserted in cases relating to agreements for compensation to procure legislation. These have been uniformly declared invalid, and *the decisions have not turned upon the ques-*

*tion, whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements. . . . Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means* for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception.

 ''. . .

 ''. . . all agreements for pecuniary considerations to control the business operations of the Government . . . are *void as against public policy, without reference to the question, whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements;* and it closes the door to temptation, by refusing them recognition in any of the courts of the country.'' (Italics supplied.)

The court was speaking only of contingent fee contracts for the procurement of government business. Contingent fee contracts to prosecute a claim against the government are valid, unless improper means are contemplated or used in the performance of the contract. *Trist v. Child,* 21 Wall. (88 U.S.) 441; *Stanton v. Embrey,* 93 U.S. 548. The distinction was recognized in *Hazelton v. Sheckels,* 202 U.S. 71, where MR. JUSTICE HOLMES said:

''But the services contemplated as a partial consideration of the promise to convey were services in procuring legislation upon a matter of public interest, in respect of which neither of the parties had any claim against the United States. An agreement upon such a consideration was held bad in *Tool Co. v. Norris,* 2 Wall. 45. Of course we are not speaking of the prosecution of a lawful claim.''

The contract before the court was an option on land which Congress was considering for the location of

437

a hall of records. It contemplated extensive services by plaintiff to induce Congress to accept the land. No improper influence or means was suggested. In holding the contract bad, the court said:

"The promise to convey did not become binding until the services were rendered, and, when rendered, according to the allegations of the bill they were legitimate. We assume that they were legitimate, but the validity of the contract depends on the nature of the original offer, and whatever their form the tendency of such offers is the same. *The objection to them rests in their tendency, not in what was done in the particular case.* Therefore a court will not be governed by the technical argument that when the offer became binding it was cut down to what was done and was harmless. *The court will not inquire what was done. If that should be improper it probably would be hidden and would not appear. In its inception the offer, however intended, necessarily invited and tended to induce improper solicitations, and it intensified the inducement by the contingency of the reward. Marshall v. B. & O. R. R.,* 16 How. 314, 335, 336." (Italics supplied.)

In *Valdes v. Larrinaga,* 233 U. S. 705, where, plaintiff says, "JUSTICE HOLMES upheld a judgment for plaintiff in an action on a contingent fee contract to furnish technical engineering assistance in the obtaining of a Puerto Rican water franchise," the court merely held that the contract there involved did not violate public policy under the decisions in *Hazelton v. Sheckels, supra,* and other cases cited by the defendant. Plaintiff, an engineer, was to receive 10 per cent of the profits of the franchise. Defendant contended that the contract, based on letters of the parties, was void. The court said:

"We shall not speculate nicely as to exactly what the law was in Porto Rica at the time when the contract

was made, but shall give the plaintiff (defendant) the benefit of the decisions upon which he relies, such as *Hazelton v. Sheckells*, 202 U. S. 71. *But we discover nothing in the language of the letters that necessarily imports, or even persuasively suggests any improper intent or dangerous tendency.*" (Italics supplied.)

*Sage v. Hampe*, 235 U.S. 99, involved a contract for the conveyance of land allotted and patented to members of the Pottawatomie Tribe under an act of Congress which prohibited its transfer within 25 years. In holding the contract void, the court, again speaking through MR. JUSTICE HOLMES said:

"And more broadly it long has been recognized that contracts that obviously and directly tend in a marked degree to bring about results that the law seeks to prevent cannot be made the ground of a successful suit. *Providence Tool Co. v. Norris*, 2 Wall. 45; *Trist v. Child*, 21 Wall. [88 U.S.] 441; *Oscanyan v. Winchester Repeating Arms Co.*, 103 U.S. 261; *Fuller v. Dame*, 18 Pick. 472."

*Crocker v. United States*, 240 U.S. 74, was an appeal from a judgment denying a claim for letter-carrier satchels delivered under a contract with the government. Claimant had employed Lorenz on a contingent fee to assist in procuring the contract. The court said:
"We are of opinion that in the transactions out of which the claim arose there was an obvious departure from recognized legal and moral standards. It began when the company employed Lorenz, upon a compensation contingent upon success, to secure the contract for furnishing the satchels . . . . Because of their baneful tendency, as here illustrated, agreements like that under which Lorenz was employed are deemed inconsistent with sound morals and public policy and therefore invalid."

439

*Steele v. Drummond,* 275 U.S. 199, cited by plaintiff, is not in point. The court expressly distinguished the contract there involved from the contracts in *Tool Co. v. Norris, Hazelton v. Sheckels, Crocker v. United States,* and other cases, in that ''Drummond was not employed by Steele or by the railroad company to secure the passage of the ordinances. He was interested as an owner of property.'' *Muschany v. United States,* 324 U.S. 49, also cited by plaintiff, does not support his contention. In that case the government contracted with a real estate agent to procure options for the purchase of certain lands for an ordinance plant, on a commission basis of 5 per cent of the purchase price. In distinguishing this contract from contingent fee contracts to procure business from the government, the court said (p. 64–65):

''*Contingent fee contracts to secure Government business for the employer of the recipient have been held invalid because of their tendency to induce improper solicitation of public officers and the exercise of political pressure. Steele v. Drummond, 275 U. S. 199, 206.* For the most part these cases have involved situations where a would-be contractor has hired a third person on a contingent fee basis to procure for the former a contract with the Government. But neither the language of these cases nor the policy behind them applies to the situation involved in this case, where the Government, not the would-be contractor, hires an agent for the purpose of soliciting offers from owners of needed land, the agent's compensation to be contingent on submission of offers acceptable to the Government. We have here a contingent fee contract of an entirely different type. It is the Government here who pays the contingent fee and pays it not for securing a contract from the Government, but a contract for the Government.'' (Italics supplied.)

In *Silverman v. Osborne Register Co.* (1946), C. C. A. (D. C.), 155 F.2d 879, the defendant was a manufacturer of ration tokens which the plaintiff as an independent salesman was endeavoring to sell to O.P.A. The government insisted on a contract with the manufacturer. Defendant then submitted a price 15 per cent above that quoted to plaintiff and procured the business. Plaintiff brought suit for the 15 per cent, claiming it as commission under an agreement with the defendant. The trial court held the contract void. The Court of Appeals affirmed the judgment, saying:

". . . we think the trial court correctly applied the underlying principle of the *Tool Co.* case (69 U. S. 45), and quite rightly disposed of the litigation with a memorandum opinion pointing out:

'The tendency of such an agreement as we have here, apart from other consideration, was to have the government pay fifteen percent more than it would presumably have paid under the circumstances. Such a contract is illegal and void on the ground of public policy and as a consequence the courts have no alternative in such a situation but to so declare it.' "

In the instant case the government was presumably caused to pay 2 cents per hour more for operators and 3-½ cents per hour more for mechanics because of Buckley's contingent fee. Prior to Buckley's employment Lewis had quoted a price of 25 cents for operators and mechanics. At the first conference of Lewis and Buckley with Colonel Rooks of the Signal Corps, Lewis claimed a mistake had been made in quoting the same price for training operators and mechanics because of the greater equipment and higher ratio of instructors needed in training mechanics than in training operators. No mistake was claimed in the quotation on op-

441

erators. Given permission to submit revised figures, Buckley submitted figures of 30 and 35 cents for operators and mechanics, respectively. Lewis submitted figures of 27 and 32 cents, and contracts were awarded on that basis. Buckley testified that one-half (3-½ cents) of the increase on mechanics, and 2 cents (the increase) for operators, was to go to him as commissions. The vice which destroyed Silverman's agreement is present here and destroys Buckley's claim to compensation.

Buckley seeks compensation for procuring contracts from the United States Government for the training of men in the Armed Services.

"The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any State."

*U. S. v. Allegheny County,* 322 U. S. 174, 183. Plaintiff contracted for a contingent fee, payable on procuring contracts from the government. The public policy of the United States declares such contracts void because of their evil and dangerous tendency, without inquiring into what was done in a particular case. *Hazelton v. Sheckels, supra.* In *Sage v. Hampe, supra,* the Supreme Court of the United States reversed, on grounds of public policy, a judgment of a state court, affirmed by the Supreme Court of Kansas. It said:

"The case at first sight seems like those in which a State decides to enforce or not to enforce a domestic contract notwithstanding or because of its tendency to cause a breach of the law of some other State. *Graves v. Johnson,* 179 Massachusetts 53, 156 Massachusetts 211. But the policy involved here is the policy

of the United States. It is not a matter that the States can regard or disregard at their will."

Executive Order 9001 requires a warranty from a contractor with the United States that he "had not employed any person to solicit or procure this contract upon any agreement for a commission, percentage, brokerage or contingent fee." Excepted from the warranty are "commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business." The extent and nature of the legal consequences of this order must be determined by Federal decisions. *Deitrick v. Greaney*, 309 U. S. 190. There are no Supreme Court decisions. *Reynolds v. Goodwin-Hill Corp.*, C. C. A. (2nd Cir.), 154 F.2d 553 (1946), and *Bradley v. American Radiator & Standard San. Corp.*, C. C. A. (2nd Cir.), 159 F. (2d) 39 (1947), are the only Court of Appeals cases in point discussed in the briefs. In the *Reynolds* case plaintiff sued for commissions for procuring contracts for the defendant from the United States Army Engineering Corps. The trial court found that plaintiff was and had been for many years the general sales agent or sales director of defendant, charged with soliciting contracts for defendant in all phases of its business, civilian and governmental. The reviewing court (JUDGES LEARNED HAND, SWAN and PHILLIPS), speaking through Judge Hand, held that it was bound by the findings of the trial court as to the nature of plaintiff's employment, and that plaintiff was within the exception of the executive order. In sustaining his claim, the court said (p. 555):

"The critical words are: 'bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business.' . . . The purpose of the section is reasonably plain: the

443

payment of contingent fees was permitted when made to an agent *employed generally to drum up business for the contractor,* presumably because it was thought wise to allow contractors to do business in their accustomed way, in spite of the possibility that the inducement of a commission might on occasion result in abuses. But it was also thought that *to employ persons to procure specific contracts upon a contingent fee,* was likely to result in selecting those who had, or were supposed to have, some especial access to officials; and that this *could not be tolerated.''* (Italics supplied.)

In the *Bradley* case the court (JUDGES SWAN, AUGUSTUS N. HAND and CLARK) in a *per curiam* opinion said of the statement just quoted, ''It is true that the pronouncement as to the employment of an agent to procure specific contracts upon a contingent fee was a dictum but we still think it was a correct interpretation of the Executive Order.'' Bradley, a manufacturer's agent for the sale of metal castings, procured a ·contract from defendant for the payment to him of one-fourth of one cent for each cast iron nose for incendiary bombs manufactured by defendant on orders procured by plaintiff from the government. He procured orders for noses in excess of 19,000,000. He brought suit for commissions alleged to be due. The trial court struck the complaint on defendant's motion. In affirming this action the reviewing court said:

*''In order to prevail the appellant must bring himself within the exception of Executive Order No. 9001,* 50 U.S.C.A. Appendix sec. 611 note, 6 F.R. 6787. The complaint shows that he has not done so. . . . The exception creates a privileged class who may receive contingent fees for securing government contracts, while others may not. *Not only should grants of spe-*

444

*cial privileges be jealously restricted, but such a re- striction is also in the interest of maintaining the integ- rity of governmental contracting procedure.* Moreover, the use of the words 'Maintained by the contractor' suggests an intention to restrict the exception to continuing relationships between the contractor and his agent. The contract alleged in the complaint vio- lates the public policy declared in the Executive Or- der.'' (Italics supplied.)

Plaintiff in his reply brief cites the recent case of *Beach v. Illinois Lumber Mfg. Co.,* (D.C. E.D Ill.) 92 F. Supp. 564 (1949), where plaintiff recovered con- tingent commissions for procuring contracts from the government. The facts found by the court bring the plaintiff within the exception of the executive order under the holding in the *Reynolds* case. Do the facts before us bring Buckley within the exception? His con- tract with defendant was limited to the procurement of specific government contracts, an employment con- demned in the *Reynolds* and *Bradley* cases. This work was a new field in which Buckley began his activities in September, 1941. Six months later, March 11, 1942, when he became the agent of defendant, he had pro- cured one contract. He had no office except his room in the Army and Navy Club. His name individually, not that of his company, was listed under the club tele- phone. He had no stationery but used that of the club. The setting implied acquaintance with and access to the procurement officers of the Armed Forces. It is not the setting of a ''bona fide sales and service agency'' which ''functions solely as a capable, experienced and ethical commercial organization.'' The facts do not make Buckley a bona fide established commercial or selling agent. His agreement with defendant violated public policy as declared by Executive Order 9001. De- fendant is in *pari delicto*. Public interest requires that

the court leave the parties where it finds them. *Silverman v. Osborne Register Co., supra.*

The decree dismissing the complaint should be sustained.