NOTICE

Decision filed 02/07/11. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-09-0533

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| STEPHEN T. MALEC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 06-MR-45 |
| | ) | |
| THE CITY OF BELLEVILLE, ILLINOIS, an Illinois | ) | |
| Municipal Corporation, THF GREEN MOUNT | ) | |
| DEVELOPMENT, LLC, a Missouri Limited | ) | |
| Liability Company, and GMCR, LLC, a Missouri | ) | |
| Limited Liability Company, | ) | Honorable |
| | ) | Lloyd A. Cueto, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE WEXSTTEN delivered the judgment of the court, with opinion.
Presiding Justice Chapman concurred in the judgment and opinion.
Justice Spomer dissented, with opinion.

**O P I N I O N**

The plaintiff, Stephen Malec, filed an action seeking declaratory and injunctive relief against the defendants, THF Green Mount Development, LLC, and GMCR, LLC (the Developers), and the City of Belleville, Illinois (the City), in the St. Clair County circuit court. The suit challenged (1) the formation of a tax-increment-financing district (TIF District) pursuant to the Tax Increment Allocation Redevelopment Act–division 74.4 of the Illinois Municipal Code (TIF Act) (65 ILCS 5/11-74.4-1 *et seq.* (West 2006)), (2) the formation of the Carlyle/Green Mount Business District (Business District) pursuant to division 74.3 of the Illinois Municipal Code (Business District Division) (65 ILCS 5/11-74.3-1 *et seq.* (West 2006)), and (3) the use of municipal sales taxes generated by the development project to reimburse the Developers for regional infrastructure improvements made pursuant

1

to an economic incentive agreement under section 8-11-20 of the Illinois Municipal Code (65 ILCS 5/8-11-20 (West 2006)). After a bench trial, the circuit court entered a judgment for the defendants on all the counts. We affirm the circuit court's order.

BACKGROUND

In 2003, the Developers began evaluating the corner of Green Mount Road and Carlyle Avenue in Belleville for a new shopping center. The TIF project area measured approximately 150 acres in size and contained three parcels: two undeveloped parcels totaling approximately 130 acres and one parcel with rundown structures. The latter parcel included approximately 18 acres and contained five structures–one mobile home and four farm buildings, which were grouped together on 2.5 acres of the parcel. The Developers purchased the property for approximately $50,000 per acre for a total of $7.5 million. In 2004, the Developers negotiated with Centex Corp., and Centex Corp. purchased the northern portion of the property totaling approximately 83 acres for residential units, leaving the Developers approximately 64 acres of the project area for private commercial and retail development.

Subdivision of Land

The TIF project area's three parcels had corresponding tax identification numbers of 09-19.0-100-005, 09-19.0-100-009, and 09-19.0-100-010 (parcels 005, 009, and 010, respectively). Two deeds from 1937 show that 009 and 010 were owned by Charles Edward Biebel in 1937. In 1958, Charles and Hilda Biebel deeded parcels 005, 009, and 010, along with another tract of land south of Carlyle Avenue, to themselves as joint tenants. On December 27, 1961, Charles Biebel, by then a widower, conveyed an eastern half of the area south of Carlyle Avenue totaling approximately 75 acres (the east one-half of the southwestern quarter of section 19) to his daughter and granddaughter, Jean Biebel Moore and Carolyn Moore. In February 1968, Charles Biebel, with Jean Biebel Moore and Edward

2

Moore as the guardians of Carolyn Moore, conveyed the southwest quarter of section 19, the area south of Carlyle Avenue (approximately 149 acres), to Chicago Title and Trust Company. In December 1969, Charles Biebel conveyed the west 20 acres of the southwest quarter of the northwest quarter of section 19 (parcel 005), a western portion of the land north of Carlyle Avenue, along with the set of farm buildings more than 60 years old, to Jean Biebel Moore. On January 5, 1973, Charles Biebel conveyed an eastern portion of the land (a part of the southwest fractional quarter of section 18 and a part of the northwest quarter of section 19, which amounted to more than five acres) located north of Carlyle Avenue (parcel 010) to Jean Biebel Moore.

Parcels 009 and 010 kept the same tax identification numbers from 1937 until the time they were conveyed by the Moore family to the Developers in 2005. At the time of the conveyance, they and parcel 005 were under the ownership of Carolyn Moore Miller and Ernest Miller. Harold Amann, and his father before him, farmed these parcels for 50 years as a single farm, approximately 143 acres of land, pursuant to an oral lease with the Moore family. Amann farmed the land profitably until the Developers, having purchased the property, terminated his lease in October 2005.

Underground Mine

Throughout 2004 and 2005, the Developers negotiated with Lowe's and Walmart as potential tenants of the project area. Both Lowe's and Walmart indicated a concern regarding the satisfactory remediation of an underground mine located under a portion of the property. On June 4, 2004, the Developers obtained a preliminary site geologic evaluation of the property from its geologic consultant, Midwest Testing. In its June 4, 2004, letter explaining its preliminary analysis, Midwest Testing noted that the commercial site was roughly a 56-acre rectangular-shaped parcel and that the proposed development included a strip shopping center composed of Lowe's and Walmart anchors. The preliminary site geologic evaluation,

3

addressed to the Developers' principal officer, Alan Bornstein (an equity holder in THF Green Mount Development, LLC), relayed that, according to maps from the Illinois Geological Survey, the site was probably underlain by an abandoned coal mine (mined by the Little Oak Coal Company) at a depth of 120 to 150 feet.

Midwest Testing noted that "[t]he risk of collapse, or subsidence, of the mined voids beneath [the] site [was] the principal concern of constructing over mined areas," that "[t]here is a similar risk of portions located immediately beyond the mapped undermined area that, although located on intact coal, would be influenced by subsidence of adjacent undermined areas," and that one occurrence of surface-reflected subsidence near the subject property had been reported. In the evaluation letter, Midwest Testing also stated the following:

"[T]o the best of our knowledge, the development in the surrounding area over the past 15 years or so has been accomplished without mine remediation. Obviously, many owners have assumed the risk of subsidence or concluded that the cost of remediation versus the risk is too high to warrant remedial action. Additionally, subsidence events in the region have been isolated and, when they have occurred, they have affected a very tiny percentage of the structures and infrastructure overlying abandoned mines. Known exceptions are the St. Clair Square, possibly, the Home Depot on Lincoln Trail, and more recently, the American TV & Appliance Store on Green Mount Road in O'Fallon, approximately one mile north of the subject site.

Options regarding the apparent undermining include: 1) proceeding without further exploration, 2) undertaking a more detailed search of available maps and data through various state and local agencies, and 3) conducting a mine subsidence evaluation. We have discussed these options with you and we understand you have

4

elected to include grouting costs in your budget at this time for site development."[1]

According to the trial testimony of Michael Malloy, the previous director of economic planning and development for the City, the City did not receive a copy of the June 4, 2004, letter from Midwest Testing. On June 6, 2005, the city council approved an initial TIF eligibility study prepared by Eugene Norber, who was the City's TIF consultant and president of Economic Development Resources (EDR). The eligibility study characterized Midwest Testing's June 4, 2004, letter, stating as follows:

"Midwest Testing, Inc. prepared a preliminary geological evaluation for property located at the northeast corner of State Route 161 (Carlyle Avenue) and Green Mount Road in Belleville, Illinois for the purpose of determining the geologic conditions that might impact proposed development. As reported by Midwest Testing, Inc. in a letter to THF Realty dated June 4, 2004, 'this site was mined for the Herrin No. 6 coal, originally by the Little Oak Coal Company.' Green Mount Road was formerly named Little Oak Road. Midwest [Testing] has determined that the impact of such mining activity will require grouting of areas from which coal was extracted, or construct columns to provide additional support for the coal 'roof.' "

At the trial, Norber admitted failing to inform the city council about the contents of the June 4, 2004, letter and, specifically, the statements therein about mine remediation being uncommon in the surrounding area. Norber admitted that he did not independently study whether mine remediation was required for development in the area and that he relied upon the Developers' representation that to develop the project, there would have to be mine remediation.

On July 1, 2005, Norber/EDR submitted for the City's consideration a TIF

---

[1] Grouting involves filling mined-out voids to prevent underground collapses that can cause subsidence at the surface.

"Redevelopment Plan" that contained, verbatim, the same characterization of the June 4, 2004, letter from Midwest Testing as had been set forth in the eligibility study.

In a mine subsidence study submitted by Midwest Testing, dated July 29, 2005, Midwest Testing noted that the conditions of the Herrin No. 6 coal seam, and the associated Little Oak Mine, which underlay the proposed area, were further explored by drilling 30 test borings at the locations shown. In the report, Midwest Testing stated the following:

"The presence of a mine beneath a developed site poses the inherent risk of a mine collapse, which can result in ground surface subsidence (*i.e.*, a sudden collapse or drop). ***

At this site, judging from past reported subsidence events in the area, the trough subsidence would be the likely form and, if it occurred, would be evident at the surface as dish-shaped depressions. The time period between mining and subsidence may vary from hours or days to decades, and the subsidence event may be one large movement or a series of smaller movements occurring over time.

* * *

The mine void information obtained from borings, coupled with the downhole video, suggests that some degree of mine degradation has already occurred over most of the site. Surface subsidence has been reported at several locations elsewhere in the region with similar conditions.

* * *

Based on conditions encountered in the borings, it is our opinion that subsidence, or 'squeezing' of the mine void has occurred. Squeezing occurs when portions of the mine collapse and is indicative of a mine that is susceptible to further collapse.

* * *

6

On a risk scale of negligible-slight-moderate-severe, we judge the majority of this site to be at the moderate category for a subsidence event under the current conditions. With the potential for pillar deterioration, and associated or independent roof collapse, it is our opinion that the risk level moves into the upper end of the moderate range within the life of the building (estimated at 50 years).

The extent of development in the undermined portions of Belleville and surrounding areas (e.g., Fairview Heights and O'Fallon) is significant. These developed areas overlie or are within the potential zone of influence of a number of abandoned coal mines."

Midwest Testing reiterated that "many owners have assumed the risk of subsidence or concluded that the cost of remediation versus the risk is too high to warrant remedial action" and that "subsidence events in the region have been isolated and, when they have occurred, they have effected [*sic*] a very tiny percentage of the structures and infrastructure overlying abandoned mines." Midwest Testing again stated that "the development in the surrounding area over the past 15 years or so has been accomplished without mine remediation with the exception of," among others, the American TV facility, for which mine grouting was completed and Midwest Testing was the lead geotechnical consultant, concluding that the risk was also in the moderate category. Midwest Testing further stated as follows:

"It is our opinion that the current projected risk level for mine subsidence suggests that risk mitigation measures should be considered. At a minimum, we recommend that a specialty contractor who specializes in grouting of subsurface mines be contacted and a cost estimate prepared for filling the mine voids, either partially or completely, beneath the facility."

Midwest Testing listed the available options as ranging from "[d]o nothing and accept

7

the risk" to "[f]ully grout the mines within the zone of influence of the desired area of protection and eliminate the subsidence risk." At the trial, Malloy testified that the City also did not receive the mine subsidence study dated July 29, 2005. Malloy acknowledged that the City generally relied on EDR's reports as its sole basis for the findings that it made with respect to the TIF and Business Districts.

On December 16, 2005, in an intercompany e-mail from Lowe's geotechnical engineer, Lowe's expressed a need to review grout test results and formed an opinion that the grouting program should include the mined areas within the influence zone of the Lowe's Garden Center, truck ramps, truck access road, and front entrance driveway. Lowe's considered it "prudent" to conduct an additional investigation to verify the reserve area beneath the building.

Traffic Impact Study

Crawford, Bunte, Brammeier (CBB), traffic and transportation engineers, prepared a traffic impact study dated February 10, 2005, evaluating the Green Mount Road/Carlyle Avenue intersection. In this study, CBB noted that the 147-acre site would be developed as approximately 64 acres of commercial development and 83 acres of residential development and that access to the residential and commercial sites would be provided on both Illinois Route 161 (Carlyle Avenue) and North Green Mount Road. The study noted that CBB's purpose "was to forecast the amount of traffic that would be generated by the proposed development, evaluate its impact upon the adjoining road system, and determine the need for roadway and/or traffic control improvements."

The traffic impact study noted, "Levels of traffic service (LOS) are quantifiable measures of traffic flow, which consider such factors as speed and travel time, traffic interruptions, safety, driving comfort, and convenience." The traffic impact study noted that level C represents a roadway operating at approximately 80% of its capacity and that level

8

D is considered acceptable for peak period conditions in urban areas.

In the traffic impact study, CBB concluded that the existing operating conditions at the intersection were acceptable during the morning peak but operations degraded considerably during the afternoon peak hour and that "an exclusive southbound right-turn lane [was] already needed at the intersection to provide acceptable conditions for existing traffic." In the traffic impact study, CBB rated the northbound approach to the intersection, the southbound approach to the intersection, and the intersection overall as LOS F. As explained in the "Highway Capacity Manual," prepared in 2000 by the Transportation Research Board of the National Academies and offered into evidence at the trial, LOS F is considered unacceptable to most drivers and often occurs with oversaturation, when arrival flow rates exceed the capacity of lane groups.

Phase I Environmental Assessment

In a "Phase I Environmental Assessment" prepared by Midwest Testing for Walmart and the Developers, dated August 17, 2005, Midwest Testing noted "minor dumping of yard and household waste *** limited to the western portion of the site near the existing mobile home and barns." Midwest Testing found no evidence of hazardous waste disposal or storage. Midwest Testing concluded that its investigations "revealed no evidence of recognized environmental conditions in connection with the subject property."

TIF Ordinances

On January 11, 2006, the City found that the property qualified under the TIF Act (65 ILCS 5/11-74.4-1 *et seq.* (West 2006)), the Business District Division (65 ILCS 5/11-74.3-1 *et seq.* (West 2006)), and the economic incentive agreement provisions in the Illinois Municipal Code (65 ILCS 5/8-11-20 (West 2006)). Accordingly, the City enacted Ordinances 6814, 6815, and 6816 (Belleville, Ill., Ordinance Nos. 6814, 6815, 6816 (eff. January 11, 2006)) (collectively, TIF ordinances), which created the TIF District, adopted

9

and approved a "Revised TIF Redevelopment Plan"[2] (Redevelopment Plan), and approved tax-increment-allocation financing to reimburse the Developers for project redevelopment costs in the TIF District.

In Ordinance 6814 (Belleville, Ill., Ordinance No. 6814 (eff. January 11, 2006)), the City found that the Carlyle Avenue/Green Mount Road redevelopment project area as a whole was blighted and had not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the Redevelopment Plan. The City adopted and approved the Redevelopment Plan dated October 17, 2005.

In the Redevelopment Plan, the City, through EDR, found that the "improved blighted" portion of the TIF area, the parcel with five rundown structures, included dilapidation, obsolescence, deterioration, structures below minimum code, excessive vacancies, a lack of ventilation, light, or sanitary facilities, inadequate utilities, deleterious land use or layout, a lack of community planning, and declining total equalized assessed value.

With regard to the two undeveloped parcels, the Redevelopment Plan described this portion as vacant because the parcels within the area had been subdivided. In the Redevelopment Plan, the City found the property to be "blighted" because, pursuant to information provided by the Department of Natural Resources, Illinois State Geological Survey, and Midwest Testing, Inc., coal mining had been conducted beneath the portion of the proposed redevelopment project area north of Carlyle Avenue. In the Redevelopment

---

[2] " 'Redevelopment plan' means the comprehensive program of the municipality for development or redevelopment intended by the payment of redevelopment project costs to reduce or eliminate those conditions the existence of which qualified the redevelopment project area as a 'blighted area' ***." 65 ILCS 5/11-74.4-3(n) (West 2006).

10

Plan, the City concluded that this factor was present to a meaningful extent and reasonably distributed throughout the vacant portion of the redevelopment project area.

Specifically, in the Redevelopment Plan, the City, through Norber and EDR, indicated, "Midwest [Testing] has determined that the impact of such mining activity will require grouting of areas from which coal was extracted, or construct columns to provide additional support for the coal 'roof.'" Pursuant to the Redevelopment Plan, the City found that the abandoned coal mine beneath the northern and eastern portions of the site rendered "[v]irtually the entire Area north of Carlyle Avenue *** at risk due to the fact that subsidence can occur beyond the area actually mined." Pursuant to the Redevelopment Plan, the City further found that "the unused mine impairs the sound growth of substantially all of the Area."

In the Redevelopment Plan, the City, through EDR, concluded that the redevelopment project area on the whole had not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to attract new development without the adoption of the Redevelopment Plan. Specifically, the City concluded that the area was "characterized by both disinvestment and neglect," that "all structures [were] vacant, obsolescent, deteriorated, and below minimum code," and that "[r]einvestment within the Area [had] been limited for many decades." The City further concluded that the public infrastructure, including public rights-of-way, was inadequate due to functional obsolescence and that significant portions of the area consisted of abandoned coal mines.

The City, through EDR, concluded in the Redevelopment Plan as follows: "Given the lack of investment within the Area [and] the $19.8 million budgeted to implement the mine remediation, infrastructure improvements, storm water management, and other TIF eligible expenditures, it is clear that 'but for' the use of tax increment financing the Area will not be

11

redeveped."

In the Redevelopment Plan, the City, through EDR, also concluded as follows:
"Public infrastructure, including public rights-of-way, is inadequate due to functional obsolescence. Significant portions of the Area consist of abandoned coal mines. Absent a municipal commitment to the development of this area–including updating the public infrastructure, and remediating the hazards posed by the unused mine–the likelihood of private investment and new growth is remote."

Ordinance 6818 Creating the Business District

Pursuant to Ordinance 6818 (Belleville, Ill., Ordinance No. 6818 (eff. January 11, 2006)), passed the same day as the TIF ordinances, the City created the Business District, approved the "Carlyle/Green Mount Business District Development Plan" (Business District Plan) prepared by EDR, and imposed a business district tax to reimburse the Developers for project redevelopment costs pursuant to section 11-74.3-3(12) of the Illinois Municipal Code (65 ILCS 5/11-74.3-3(12) (West 2006)). In Ordinance 6818, the City depicted the boundaries of the Business District, which is a part of the TIF District (the southern half of the approximately 150-acre TIF redevelopment project area) and is approximately 70 acres in size and consists of two parcels.

Pursuant to section 11-74.3-5(3) of the Illinois Municipal Code (65 ILCS 5/11-74.3-5(3) (West 2006)), the City made the following findings, based on the facts set forth in the Business District Plan:

"The Business District is a blighted area; that, by reason of the predominance of defective or inadequate street layout, unsanitary or unsafe conditions, deterioration of site improvements, or the existence of conditions which endanger life or property by fire or other causes, or any combination of those factors, constitutes an economic or social liability or a menace to the public health, safety, morals, or welfare in its

12

present condition and use.

The Business District, on the whole, has not been subject to growth and development through investment by private enterprises or would not reasonably be anticipated to be developed without the adoption of the Business District Plan." Belleville, Ill., Ordinance No. 6818 (eff. January 11, 2006).

In the Business District Plan, dated July 1, 2005, EDR noted that the Business District was bounded on the north by vacant property, on the east by the YMCA, on the south by Carlyle Avenue, and on the west by Green Mount Road. In the section of the Business District Plan involving the basis for blight, EDR noted that the district contained two parcels (parcels 005 and 010)–an 18.75-acre parcel with five structures, including one mobile home and four farm buildings, and a 42-acre unimproved parcel used for agricultural purposes.

In the Business District Plan, EDR concluded that, with its two-lane configuration, Green Mount Road could not adequately accommodate current traffic volumes, which the Illinois Department of Transportation reported as 15,500 to 16,300 vehicles per day. EDR noted that the traffic impact study identified the roads' level of service at F during the afternoon peak hour and that level F traffic volumes exceed the capacity of the intersection and are classified as "breakdown flow." EDR also noted that an interior roadway must be removed, because it was in disrepair and inadequate to accommodate redevelopment. Thus, EDR concluded that the street layout was inadequate and represented an impediment to development within the Business District.

In the Business District Plan, EDR found unsanitary or unsafe conditions, noting that all five structures on the property failed to meet building code requirements, that virtually the entire district was subject to mine subsidence, an unsafe condition that endangers the property itself, and that the level of service F identified in the traffic impact study connoted traffic congestion that had reached unsafe levels during the afternoon peak hours.

13

In the Business District Plan, EDR found deterioration of site improvements, noting the major defects of the five structures in the district. EDR also found the existence of conditions which endanger life or property by fire or other causes with regard to the structures and noted that the undermining and subsidence potential within the Business District was also an unsafe condition endangering the property. EDR concluded that the combination of the factors above constituted an economic or social liability or a menace to the public health, safety, morals, or welfare in its present condition and use. EDR concluded that the Business District on the whole was not subject to growth and development through private investment and would not reasonably be anticipated to be developed without a Business District Plan.

Ordinance 6819

Pursuant to Ordinance 6819 (Belleville, Ill., Ordinance No. 6819 (eff. January 11, 2006)), also passed on January 11, 2006, the City noted that it had the authority under the Illinois Municipal Code (65 ILCS 5/8-11-20 (West 2006)) to share a portion of any retailer's occupation taxes and service occupation taxes generated by a development project with the Developers. Accordingly, the City authorized the use of general sales tax revenues, in addition to the TIF and business district tax financing, to reimburse the Developers for project development costs through an economic incentive agreement pursuant to section 8-11-20 of the Illinois Municipal Code (65 ILCS 5/8-11-20 (West 2006)). Pursuant to the Illinois Municipal Code, the City found, *inter alia*, that the project area was vacant and had remained vacant for at least one year, that the development project was expected to create or retain job opportunities within the City, and that without the "Redevelopment Agreement," the development project would not be possible. Attached as exhibit B to Ordinance 6819 was EDR's October 2005 findings, which also indicated that the property was vacant and had remained vacant for at least one year. EDR's findings further indicated the following:

14

"For that portion of the Project's area that is currently developed:

(A) The buildings on the property no longer comply with current building codes.

Field investigations by EDR and the City in 2005 have shown that the five structures on the developed parcel (parcel *** 005) do not comply with current building codes.

(B) The buildings on the property have remained less than significantly occupied or underutilized for a period of at least one year. The City concluded that it was thereby authorized to enter into the Redevelopment Agreement."

*Redevelopment Agreement*

Having found that the property qualified under the TIF Act (65 ILCS 5/11-74.4-1 *et seq.* (West 2006)), the Business District Division (65 ILCS 5/11-74.3-1 *et seq.* (West 2006)), and section 8-11-20 of the Illinois Municipal Code (65 ILCS 5/8-11-20 (West 2006)), the City and the Developers executed a "Redevelopment Agreement." Pursuant to the Redevelopment Agreement, the City agreed to provide funding to the Developers for the development project from incremental property taxes, business district taxes, and municipal sales taxes generated by the development project.

In the Redevelopment Agreement, "redevelopment project costs" were defined as "all reasonable or necessary costs actually incurred in performing the Work and any such costs incidental to the Redevelopment Plan or the Redevelopment Project." Those costs were to include, *inter alia*, "all other costs authorized for reimbursement pursuant to the Redevelopment Plan and the TIF Act." In the Redevelopment Agreement, the parties agreed to the following definition:

"Reimbursable Redevelopment Project Costs. All sums advanced by the Developer under this Article II shall constitute Reimbursable Redevelopment Project

15

Costs to be reimbursed to the Developer from the proceeds of Obligations issued as provided herein, to the extent permitted by law."

In the Redevelopment Agreement, the City agreed to reimburse the Developers for the verified "Reimbursable Redevelopment Project Costs" of the redevelopment project in an amount not to exceed $19,800 in the aggregate. It stated as follows: "Nothing in this Agreement shall obligate the City to issue Obligations to reimburse the Developer for any cost that is not incurred pursuant to the TIF Act or that does not qualify as a 'redevelopment project cost' under the TIF Act." The agreement required the Developers to provide itemized invoices, receipts, or other information requested by the City to confirm that any such cost qualified as a redevelopment project cost under the TIF Act. In article II of the Redevelopment Agreement, the Developers agreed, among other things, to make a contribution to the City's "Main Street Streetscape Program" in the amount of $250,000.

In a summary report, dated October 18, 2005, from the Developers to Bornstein, the Developers listed as a line item of the commercial development project "City Funding" in the amount of $250,000. At the trial, Bornstein characterized the $250,000 as "one of several disbursements or payments that [the Developers] made for the project for the community" to be "a good corporate citizen in the community." Bornstein testified that the Developers regularly sought to contribute to the community and asked the City for some suggestions, and the City noted that it had been working on its downtown redevelopment, for which the Developers were happy to contribute the $250,000. Bornstein testified that the Developers also made payments to local school districts for curriculum development. Bornstein testified that the contribution followed the Developers' intention of making a long-term investment and being a long-term participant in the community.

Pursuant to the Redevelopment Agreement, the Developers purchased the property, spent more than $20 million to widen and restructure Green Mount Road, widen Carlyle

16

Avenue, rebuild and resignalize the Green Mount Road/Carlyle Avenue intersection, install and improve water service, natural gas, electric utilities, and sewers, create regional storm water detention to serve the property and over 400 acres around it, and remediate part of the underground coal mine.

The Plaintiff's Action

On February 17, 2006, the plaintiff, as a City resident paying property and sales taxes levied by the City,[3] filed a complaint, and thereafter an amended complaint, against the City and the Developers. The plaintiff sought an order invalidating Ordinances 6814, 6815, 6816, 6818, and 6819 (Belleville, Ill., Ordinance Nos. 6814, 6815, 6816, 6818, 6819 (eff. January 11, 2006)).

In count I of the plaintiff's complaint, the plaintiff alleged that the formation of the TIF District and the resulting tax increment financing violated the provisions of the TIF Act because, *inter alia*, the land included within the TIF District did not qualify as "blighted" as that term is defined in the TIF Act (65 ILCS 5/11-74.4-3(a) (West 2006)). Specifically, the plaintiff alleged that (1) the agricultural area of the TIF District did not qualify as "vacant" for inclusion in a TIF District, (2) a producing farm field with an abandoned mine underneath did not qualify as an "unused mine" for purposes of the TIF Act, and (3) the land would have developed in the absence of tax increment financing. See 65 ILCS 5/11-74.4-3(a) (West 2006).

---

[3]In a previous appeal to this court, we held that the plaintiff, as a taxpayer of a municipality, has standing to challenge that municipality's exercise of taxing and spending power under the TIF Act (65 ILCS 5/11-74.4-1 *et seq.* (West 2006)) and division 74.3 of the Illinois Municipal Code (65 ILCS 5/11-74.3-1 *et seq.* (West 2006)) as well as its making of an economic incentive agreement pursuant to section 8-11-20 of the Illinois Municipal Code (65 ILCS 5/8-11-20 (West 2006)). *Malec v. City of Belleville*, 384 Ill. App. 3d 465 (2008).

17

In count II of the plaintiff's complaint, the plaintiff referenced Ordinance 6818 (Belleville, Ill., Ordinance No. 6818 (eff. January 11, 2006)) and alleged that the imposition of the sales tax pursuant to section 11-74.3-3(12) of the Illinois Municipal Code (65 ILCS 5/11-74.3-3(12) (West 2006)) violated the provisions of section 11-74.3-5(3) of the Illinois Municipal Code (65 ILCS 5/11-74.3-5(3) (West 2006)) because the Business District, created by Ordinance 6818, did not qualify as "blighted." See 65 ILCS 5/11-74.3-5(3)(i) (West 2006). Specifically, in count II of the complaint, the plaintiff alleged that a producing farm field cannot be a "blighted area" or an "economic liability" as required by the Business District Division. See 65 ILCS 5/11-74.3-5(3)(i) (West 2006). The plaintiff also alleged that the Business District violated the Business District Division because there was reason to believe that the Business District would not develop in the absence of the imposition of a business district sales tax. See 65 ILCS 5/11-74.3-5(3)(ii) (West 2006).

In count III of the complaint, the plaintiff referenced Ordinance 6819 (Belleville, Ill., Ordinance No. 6819 (eff. January 11, 2006)) and the corresponding Redevelopment Agreement to allege that procedural and substantive defects with the approval of the Redevelopment Agreement violated section 8-11-20 of the Illinois Municipal Code (65 ILCS 5/8-11-20 (West 2006)), making the resulting economic incentive agreement, which allows the City to share general sales tax revenues with the Developers, illegal. Specifically, the plaintiff alleged that a producing farm field is not "vacant" pursuant to section 8-11-20 of the Illinois Municipal Code (65 ILCS 5/8-11-20 (West 2006)) and that the $250,000 payment to the City by the Developers, which the plaintiff characterized as a "signing bonus," was not authorized by the TIF Act, the Business District Division, or section 8-11-20 of the Illinois Municipal Code. The plaintiff prayed that the circuit court declare all the ordinances invalid and enjoin the City from expending public funds to carry out their terms.

On August 24, 2009, the following, additional evidence was adduced at the trial.

18

Amann testified that in all the years he had farmed the property, he had not witnessed mine subsidence on the property. Amann acknowledged, however, that he had witnessed mine subsidence in the area, *i.e.*, a house located next to the farm property at issue had settled about a foot and a half. Amann also acknowledged that he had sold a local parcel, which had experienced mine subsidence, for $12,000 an acre, and noted that the property at issue here, on which he had not yet seen evidence of mine subsidence, sold for $50,000 an acre.

Amann testified that he at no time experienced traffic problems when traveling to the site. Amann testified that, other than the lack of code enforcement on the buildings as they deteriorated, he did not witness any menace to society located on the property. Amann testified, however, that to the north of the mobile home, persons had dumped "truckloads" of trash onto the property. Amann also acknowledged that before redevelopment, during a rain downpour, State Route 161 (Carlyle Avenue) experienced flooding.

Amann testified that in the previous 5 to 10 years, on approximately four to five occasions, he was approached by a potential buyer of the property, asking if he was the property owner. Amann testified that he witnessed development in the area, additions to the corner gas station, and new buildings, including the credit union building. Amann testified that the YMCA built its development on the property approximately 15 years ago.

Daniel Greenwood, a geotechnical engineer/project manager who was previously employed at Midwest Testing, testified that once subsidence is observed at the surface, the risk is judged to be severe. Greenwood opined, "Once decay of the mine occurs and the roof begins to collapse such that arching begins and you have a collapse that propagates through the rock into the soil and is exposed at the surface, at that point many sources of strain are in motion." Greenwood testified that it becomes very difficult and expensive to terminate subsidence once a site has begun to subside at the surface. Greenwood testified that the

19

Developers selected full saturation grouting of the buildings and the immediate surrounding area.

Greenwood testified that in discussions with state geologists, Midwest Testing learned that a site in the immediate vicinity, north of the subject site, had experienced a subsidence event in a farmer's driveway. On cross-examination, Greenwood testified that a risk of a 12-inch subsidence, like the one that occurred at a local Grandpa Pigeons establishment, could be catastrophic, even fatal if someone was in the building when it collapsed. Greenwood described the mine in the project area as abandoned and properly sealed. Greenwood explained that because the mine was not being used, he would consider it an unused mine.

When asked whether parts of Carlyle Avenue and Green Mount Road were within the zone of influence over the mine so that they were threatened, Greenwood stated that in the northwest corner of the development near Lowe's, the mine extended to the west and encroached under Green Mount Road and that the mine extended to the south to Carlyle Avenue. Greenwood testified that he visited the site in the previous two weeks and did not see a crack in either building. Greenwood testified that he had never seen or heard of subsidence in a building that had been properly grouted.

Bornstein testified that he had advised Norber that, based on Midwest Testing's information and conversations with agents of Walmart and Lowe's, the site would require mine remediation. Bornstein acknowledged, however, that before a subsidence study had been completed, the Developers had determined that they would include mine remediation costs in the development budget. Bornstein testified that the Developers would not have purchased the project area without mine remediation, explaining that a subsidence event caused property values to decrease and would have negatively affected the Developers as the owners of the property. Bornstein testified that under the terms of the site development agreement with, for example, Lowe's, the Developers were required to remediate the mine

20

so that Lowe's would be willing to operate a building on the site. Bornstein testified that Walmart paid for its mine remediation.

Malloy testified that before the proposed development here, no one had expressed interest in the property and no one had requested a building permit. Likewise, Mark Eckert, who had been the mayor of Belleville since 2004 and was previously a member of the city council, testified that he was unaware of any interest in building permits or development interest in the area before the project at issue here. Mayor Eckert testified that the redevelopment site had remained empty since he was a young man. Mayor Eckert testified that the Developers approached Malloy and Mayor Kern in late 2003 or early 2004, indicating that Walmart was looking to build a supercenter, and the City made it clear that it wanted to be a part of the partnership to locate the supercenter in Belleville.

Mayor Eckert testified that the Carlyle Avenue/Green Mount Road intersection experienced a "fair amount of traffic" and that the road experienced flooding west of the YMCA toward the intersection with Green Mount Road. Mayor Eckert testified that the proposed project area had also been the location of a sexual assault in the spring of 2005. Mayor Eckert testified that he was also familiar with local mine subsidence events, including the incident at Grandpa Pigeons in Belleville. Mayor Eckert testified that he had witnessed property destroyed by mine subsidence, including area school buildings. Mayor Eckert testified that subsidence issues were addressed because the City did not want to see a development that it relied on for sales tax have a major subsidence event.

Mayor Eckert testified that at one time Southwestern Illinois College (SWIC) had indicated there were storm drainage issues, but SWIC and YMCA changed their minds about the need to remedy those issues. Mayor Eckert testified as follows:

"So when that all changed one of the things that was mentioned well, since we're not doing all this green space [for the YMCA] now do you have any capital projects,

21

anything going on, and we immediately said well, we're in the process of trying to jump start our downtown and we had started a project with–a street scape project on about a 13 block area in downtown Belleville that has turned out to be very successful. It was very expensive. And that's when Mr. Norber–not Mr. Norber, Mr. Bornstein and Mr. Malloy came up with this contribution towards the [C]ity's project."

Norber of EDR testified that his responsibilities included an evaluation of the areas to determine eligibility under the TIF Act and the Business District Division and to review the area for an economic incentive agreement. Norber testified that there was no reason to anticipate or expect that the area would develop without assistance. Norber testified that this TIF District was put together by the City to induce development and that the City had one respondent to the request for proposals, and the respondent built its project. Norber acknowledged that in April 2005 he and the Developers and the City had been working on the project for a year and a half and that the Developers had the land under contract. Norber also acknowledged that THF Green Mount Development, LLC, is a preferred Walmart developer.

Norber testified that an underground mine's risk of subsidence affects land value, in that once subsidence occurs, the land's value decreases greatly. Norber acknowledged, however, that in the Green Mount Road Corridor, the area along Green Mount Road north to Highway 64/40 in Shiloh, there was a trend of residential development, even though the Green Mount Road Corridor is undermined. Norber testified that the LOS level of F implicates a safety problem because as "cars sit longer, people get aggravated [and] act irrationally."

The plaintiff presented the expert testimony of Dr. Ronald Yarbrough, a professor emeritus who instituted the geology program at Southern Illinois University. Dr. Yarbrough

22

testified that grouting is necessary only when a mine has experienced a subsidence event. Dr. Yarbrough testified that the limestone overburden above the Little Oak Coal Mine and beneath the subject property was extremely strong. Dr. Yarbrough concluded that the impact of surface construction would be negligible to the geology underneath and that, should a subsidence event occur, it might not impact or be observed at the surface. Dr. Yarbrough testified that in the instances where he was involved in grouting or backfilling a building, he observed subsidence in the near vicinity after the grouting occurred, and additional subsidence occurred to previously undamaged homes.

Dr. Yarbrough testified that the Department of Natural Resources purposefully does not use the term "unused mine" but instead refers to a mine as "active" or "abandoned." Yarbrough testified that there is no such thing as an unused underground coal mine. Yarbrough explained: "[W]hen we abandon a coal mine we seal it off from any people ever getting into it. Now, a strip mine can be unused because it's on the surface and we have a lot of strip mines that are being used for something else other than mines today."

The plaintiff's architect expert, Theodore Johnson, testified that he spent 75% of his time as a development manager for Costco Wholesale, with the remaining 25% consulting with municipalities and school districts. The plaintiff offered into evidence a letter, dated November 19, 2008, wherein Johnson opined that the blighting factors of dilapidation, obsolescence, deterioration, the presence of structures below minimum code, excessive vacancies, a lack of ventilation, light, or sanitary facilities, and inadequate utilities were specific to the five structures which composed the farmstead on the improved parcel. Johnson opined that the blighting factors relating to the structures were limited to approximately 2.5 acres of the 18-acre improved parcel. Thus, Johnson opined that the seven factors were not present to a meaningful extent and reasonably distributed throughout the improved area, as required by the TIF Act.

In his analysis, Johnson also evaluated the two undeveloped parcels used for commercial agricultural purposes. Johnson concurred that a portion of the redevelopment project area contained an abandoned underground mine below the surface of the farm fields. Johnson opined that the existence of the underground mine did not impair the sound growth of the redevelopment project area. Johnson noted that the occurrence of surface-reflected subsidence was extremely limited in the general area.

With regard to the TIF Act's "but for" provision (65 ILCS 5/11-74.4-3(n) (West 2006)), Johnson in his report noted that there had been considerable investment in the adjacent area by private sector developers, including the residential subdivision directly west of the subject property, the Moto Mart, Strano Realty, Catholic & Community Bank, Greenmount Road Church of Christ located in the southwest quadrant, and the YMCA directly east of the property. Johnson opined that mine remediation was not required for the development to occur and that the redevelopment project area did not meet the "but for" provision of the TIF Act.

With regard to the Business District Division, Johnson opined that the private driveway to the 70-acre farmstead existing in July 2005 was sufficient to serve the farmstead in its present condition and use and that the existing adjacent Green Mount Road and Carlyle Avenue were capable of serving the property in its present use. Thus, he found no "defective or inadequate street layout" to find that the Business District was blighted.

Johnson agreed that the 2.5-acre farmstead buildings were likely unsafe and lacked sanitary facilities but noted that this area represented only 3.5% of the total 70 acres of the Business District. Johnson thereby opined that there was not a predominance of the deterioration of site improvements. Johnson also opined that because subsidence events in the region were isolated and the intersection level classifications were not a determination of safety, there was no predominance of "unsanitary or unsafe conditions" to find that the

24

Business District was blighted.

Johnson testified that because the farmstead structures were limited to 2.5 acres and because the subsidence events in the region had been isolated, there was not a predominance of conditions which endangered life or property by fire or other causes. With regard to the "but for" test of the Business District Act (65 ILCS 5/11-74.3-5(3) (West 2006)), Johnson testified that the area would have developed, as many of the adjacent areas had, without the adoption of a Business District Plan.

With regard to the factors involved for the economic incentive agreement of the property proposed for commercial development in the Business District Plan, Johnson opined that the property was not vacant–it contained a farmstead and was under cultivation for agricultural crops. Johnson also stated that the property would reasonably be anticipated to develop without the adoption of an economic development agreement.

Johnson's trial testimony reiterated his findings in his report. When asked whether a mine could be above ground, Johnson answered: "An above ground mine? You've got me there. I thought mines were[–] *** I was under the impression most mines were underground."

Johnson testified that he had reviewed reports by Midwest Testing indicating a slight risk of subsidence and that the June 4, 2004, analysis prepared by Midwest Testing formed the basis for his opinion. Johnson acknowledged that, based on the report from Midwest Testing, 60% of the 70-acre parcel was undermined. Johnson testified that he had not seen the Midwest Testing subsidence study dated July 29, 2005, in which Midwest Testing judged that most of the site was in the moderate category for a subsidence event. In answering a hypothetical question in which he was asked, after reading excerpts from the 2005 report, whether Costco should build on the property, Johnson testified that he would advise Costco "to walk." Johnson testified that Costco is self-insured and would not want to take any risk

25

of that type.

Johnson testified that the blighting factors were overstated. Johnson testified that there was not a predominance of illegal dumping, although Johnson noted the series of photographs within the area of the five structures showing materials that were dumped in the area. Johnson also noted that the environmental report prepared by Midwest Testing commented that there was a very small area where dumping had occurred on the western portion of the subject property. Johnson also testified that the conditions present on the site, *i.e.*, the agricultural land, did not constitute an economic liability in its present condition.

With regard to growth and development within the Business District, Johnson testified that the Business District was not necessary for the future growth and development of the area. Johnson testified that in the general area, there had been growth and development by both private and public investment–the YMCA, SWIC, and various residential development occurring in the Green Mount Road Corridor. Johnson acknowledged that the Graceland subdivision, SWIC, and the other businesses located in the southwest quadrant of the Green Mount Road/Carlyle Avenue intersection, other than the YMCA, were not undermined.

Similar to his report findings with regard to the economic incentive agreement, Johnson testified that the property did not qualify for sales tax sharing. Johnson testified that the property was not vacant. Johnson testified, "In land use planning vacant means void of development, void of activity." Johnson testified that, instead, the site was an active commercial farm and could not be considered vacant.

The evidence at the trial revealed that the 80-acre residential portion of the land was being developed as a "Planned Unit Development" (PUD). The PUD approved by the City in November 2005 was for 374 residences. No mine remediation was planned for or had occurred on the residential portion of the site, notwithstanding Midwest Testing's report that the subsidence risks in the residential portion of the site were equal to those in the

26

commercial portion.

On September 16, 2009, the circuit court entered a judgment against the plaintiff on all the counts of the amended complaint. The circuit court's opinion included the following findings and conclusions.

Referencing count I of the complaint, the plaintiff's allegations involving the TIF ordinances, the circuit court found that, with regard to the improved area of the TIF District, the evidence showed the existence of more than 5 of the 13 "blighting" factors: that the buildings were dilapidated, obsolete, below minimum code standards, without electric utility service, without sanitary sewer utility service, without natural gas utility service, and without potable water utility service; that the entire parcel suffered from excessive vacancies and was without sanitary sewer utility service, storm sewer utility service, natural gas utility service, or potable water utility service; and that the major intersection was failing (*i.e.*, was obsolete with a deleterious layout). The circuit court concluded that the blight factors were present to a meaningful extent and reasonably distributed throughout the improved part of the area.

The circuit court concluded that the commercial farmland had been subdivided into more than three smaller tracts between 1950 and 1990 and was therefore "vacant." The circuit court rejected the plaintiff's contention that the land was subject to the recording requirements of the Plat Act (765 ILCS 205/0.01 *et seq.* (West 2006)) and that the plat had not been properly certified, acknowledged, approved, and recorded or filed in accordance with the Plat Act. The circuit court held that the land was considered vacant because it had been subdivided and that, accordingly, it need not also qualify under the second method described in the section.

The circuit court concluded that the 130-acre portion of the TIF District also "consisted of an unused mine," noting that mine maps proved that the mine was more than reasonably distributed throughout the vacant part of the TIF District. The circuit court

27

concluded that the City did not abuse its discretion when it found that the sound growth of the TIF District area had been impaired by the mine.

The circuit court found that no development and virtually no interest in the development had existed for many decades and that the Developers were the only parties to respond to the City's request for development proposals. The circuit court stated, "Decades of non-growth and non-development, broken finally by the enactment of ordinances that permitted the private financing of indispensable regional infrastructure[,] are compelling confirmation of the city council's determination that the land would remain as it had been without the municipal assistance." The court concluded that the City did not abuse its discretion when it found that development had not occurred and was not reasonably anticipated to occur on the subject property without TIF assistance and that the subject property therefore satisfied the TIF Act's "but for" test.

With regard to the plaintiff's allegations involving the Business District Division, the circuit court found that the blight conditions were currently present. The circuit court found that there were problems that constituted a menace to safety in their current condition and use: the failing intersection structures that were below code, unsound, dangerous, and easily accessible; overgrown areas; illegal dumping; and conditions that endangered life and property. The court further found that the Business District had not been subject to growth and development and that it would not reasonably be anticipated to develop without the assistance of the Business District Division.

With regard to plaintiff's allegations in count III involving the economic incentive agreement, the circuit court noted that in Ordinance 6819 (Belleville, Ill., Ordinance No. 6819 (eff. January 11, 2006)), the City determined that the area involved in the economic incentive agreement was "vacant." The circuit court held that although the Illinois Municipal Code did not delineate the treatment of property that has a large part with no buildings and

a relatively smaller part with buildings, the City had reached the correct conclusions and met both the spirit and the letter of the Illinois Municipal Code. The court held that a land's use did not have any bearing on the vacancy analysis and that, therefore, farmland may be considered to be "vacant." The court thereby found in favor of the defendants and entered a judgment on their behalf on all the counts.

ANALYSIS

TIF Act

The TIF Act (65 ILCS 5/11-74.4-1 *et seq.* (West 2006)) became effective in Illinois on January 10, 1977. *People ex rel. City of Canton v. Crouch*, 79 Ill. 2d 356, 360 (1980). The purpose of the TIF Act is to "provide municipalities with the means to eradicate blighted conditions by developing or redeveloping areas so as to prevent the further deterioration of the tax bases of these areas and to remove the threat to the health, safety, morals, and welfare of the public that blighted conditions present." *Board of Education, Pleasantdale School District No. 107 v. Village of Burr Ridge*, 341 Ill. App. 3d 1004, 1010 (2003) (citing 65 ILCS 5/11-74.4-2(a), (b), (c) (West 1994)). The TIF Act enables a municipality to eliminate blighted conditions by collecting real property tax increment revenues from local taxing districts within the TIF District and diverting the revenues to fund TIF District development projects. *Board of Education, Pleasantdale School District No. 107*, 341 Ill. App. 3d at 1010-11 (citing 65 ILCS 5/11-74.4-2(a), (c), 11-74.4-3(t) (West 1994)).

To be eligible for tax increment financing, a municipality must first establish that the proposed redevelopment project area is a "blighted" area. 65 ILCS 5/11-74.4-3(a) (West 2006). Vacant land may be considered blighted if the area consists of one or more unused mines. 65 ILCS 5/11-74.4-3(a)(3)(A) (West 2006). The one or more unused mines found to be in existence must be (1) present to a meaningful extent so that a municipality may reasonably find that the factor is clearly present within the intent of the TIF Act and (2)

29

reasonably distributed throughout the vacant part of the redevelopment project area to which it pertains. 65 ILCS 5/11-74.4-3(a)(3) (West 2006). The TIF Act also provides that no redevelopment plan shall be adopted unless a municipality finds that the redevelopment project area on the whole has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan. 65 ILCS 5/11-74.4-3(n)(J)(1) (West 2006). This latter requirement is commonly referred to as the "but for" test.

When a municipality approves the findings of blight in an ordinance, a presumption exists that the municipality's findings of blight were valid. *Geisler v. City of Wood River*, 383 Ill. App. 3d 828, 850 (2008). It is the plaintiff's burden to overcome, by clear and convincing evidence, the presumption that a city's findings of blight were valid. *Geisler*, 383 Ill. App. 3d at 850. An appellate court will not set aside a trial court's finding that the plaintiff failed to meet his burden unless it is contrary to the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850. A circuit court's judgment is contrary to the manifest weight of the evidence only when an opposite conclusion is apparent or when its findings appear to be unreasonable, arbitrary, or not based on the evidence. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

The plaintiff argues that various misrepresentations made by the defendants should shift the burden of proof to the defendants and remove the presumptive power of legislative findings. Specifically, the plaintiff argues that the ordinances were induced by, *inter alia*, the following misrepresentations: (1) the TIF eligibility study and the TIF Redevelopment Plan's mischaracterization of Midwest Testing's June 4, 2004, letter, (2) Norber's failure to inform the City regarding the June 4, 2004, letter and the statements therein about mine remediation being uncommon, (3) the alleged contradiction between Norber's conclusion that "[t]he extensive undermining, traffic congestion, dumping, and easily accessed deteriorated

30

and unsafe site improvements, and the problems attendant to these conditions, constitute a menace to safety in their current condition and use" and the conclusion in the Phase I Environmental Assessment that there was "no evidence of recognized environmental conditions," and (4) the alleged mischaracterization in the Business District Plan regarding the unsafe conditions at the intersection when the CBB traffic study did not explicitly so state.

We have reviewed the record and find that neither the Developers' conduct nor the City's conduct rose to the level of intentional misrepresentation or fraud, and we reject the plaintiff's suggestion that this case requires a different standard of review on that basis.

*Unused Mine*

The plaintiff contends that in the TIF Act, the legislature designated only surface features, such as strip mines, as blighting factors for agricultural land and that the legislature did not intend to include an underground mine as a blighting factor. The plaintiff also submits that even though there is an abandoned mine more than 100 feet below the producing farm, the farm does not "consist" of an "unused mine." The plaintiff contends, "[I]t makes no sense to say that the property here 'consists of' a mine, when the dominant feature of the property is not the closed underground mine, but rather the working farm on the surface."

Because this issue involves statutory interpretation and there is no question of fact to be resolved, we review this issue *de novo*. See *Geisler*, 383 Ill. App. 3d at 839.

The supreme court has stated the following:

"The fundamental rule of statutory interpretation is to give effect to the intention of the legislature. A court first looks to the words of the statute. The language of the statute is the best indication of the legislative intent. When the statutory language is clear, it must be given effect without resort to other tools of interpretation. In interpreting a statute, it is never proper for a court to depart from

31

plain language by reading into a statute exceptions, limitations, or conditions which conflict with the clearly expressed legislative intent." *County of Knox ex rel. Masterson v. Highlands*, *L.L.C.*, 188 Ill. 2d 546, 556 (1999).

Because the best indication of legislative intent is the plain and ordinary meaning of the language used, we may refer to a dictionary to determine the meaning of an otherwise undefined word or phrase. *People v. Fort*, 373 Ill. App. 3d 882, 885 (2007). Black's Law Dictionary defines "mine" as "[a]n excavation in the earth from which ores, coal, or other mineral substances are removed by digging or other mining methods." Black's Law Dictionary 994 (6th ed. 1990); see also Webster's New Dictionary 411 (2003) ("mine" is "a large excavation made in the earth, from which to extract ores, coal, etc." or "a deposit of ore, coal, etc."). Webster's New Dictionary defines "unused" as "not in use." Webster's New Dictionary 707 (2003).

It strains credulity to characterize the unused, underground mine in this case as falling outside the plain meaning of "unused mine" as used in the TIF Act. The plaintiff seeks to include the word "dominant" in the statute, arguing that "the dominant feature of the property is not the closed underground mine, but rather the working farm on the surface." The statute does not so state, however, and we have no right to read into a statute words not found therein. See *Hagen v. City of Rock Island*, 18 Ill. 2d 174, 179 (1959). We therefore reject the plaintiff's argument.

### *Vacant Land*

The plaintiff contends that the City and the circuit court improperly concluded that the farmland portion of the TIF District was vacant through subdivision and therefore blighted, that the City and the Developers improperly failed to file a plat of subdivision before approving the TIF District, and that, even if they were not required to do so, the farmland was under common control and use when the TIF District was formed, negating

32

any subdivision of the land by intrafamily deeds dating back to 1937.

Because this issue also involves statutory interpretation and there is no question of fact to be resolved, we review the circuit court's resolution of this issue *de novo*. *Geisler*, 383 Ill. App. 3d at 839.

The TIF Act provides, in pertinent part, as follows:

"(v) As used in subsection (a) of Section 11-74.4-3 of this Act, 'vacant land' means any parcel or combination of parcels of real property without industrial, commercial, and residential buildings which has not been used for commercial agricultural purposes within 5 years prior to the designation of the redevelopment project area, unless the parcel is included in an industrial park conservation area or the parcel has been subdivided; provided that if the parcel was part of a larger tract that has been divided into 3 or more smaller tracts that were accepted for recording during the period from 1950 to 1990, then the parcel shall be deemed to have been subdivided, and all proceedings and actions of the municipality taken in that connection with respect to any previously approved or designated redevelopment project area or amended redevelopment project area are hereby validated and hereby declared to be legally sufficient for all purposes of this Act. For purposes of this Section and only for land subject to the subdivision requirements of the Plat Act, land is subdivided when the original plat of the proposed Redevelopment Project Area or relevant portion thereof has been properly certified, acknowledged, approved, and recorded or filed in accordance with the Plat Act and a preliminary plat, if any, for any subsequent phases of the proposed Redevelopment Project Area or relevant portion thereof has been properly approved and filed in accordance with the applicable ordinance of the municipality."  65 ILCS 5/11-74.4-3(v) (West 2006).

"Parcel" is defined in Black's Law Dictionary as "[a] part or portion of land," "a

contiguous quantity of land in the possession of an owner," or "[a] contiguous quantity of land in possession of, owned by, or recorded as property of the same claimant person or company." Black's Law Dictionary 1112 (6th ed. 1990). "Tract of land" is defined in Black's Law Dictionary as "[a] lot, piece or parcel of land, of greater or less size, the term not importing, in itself, any precise dimension, though term generally refers to a large piece of land." Black's Law Dictionary 1492 (6th ed. 1990). "Tract of land" is "synonymous with parcel of land and does not have reference to size but to contiguous quantity of land." Black's Law Dictionary 1492 (6th ed. 1990).

Whether the parcel here qualifies as "vacant land" under the TIF Act does not depend on how the land was controlled. This section clearly and plainly provides that "vacant land" means a parcel that has been subdivided. Because the deeds in evidence demonstrate that the relevant parcel was a part of a larger tract that had been divided into three or more smaller tracts that were accepted for recording during the period from 1950 and 1990, the parcels are deemed to have been subdivided and therefore "vacant" pursuant to the TIF Act. See 65 ILCS 5/11-74.4-3(v) (West 2006).

The plaintiff argues that "recordation of a deed unaccompanied by a plat cannot be a 'subdivision' for purposes of Section 3(v) of the TIF Act." The plaintiff also argues that when the TIF ordinances were adopted, even if the land had been subdivided pursuant to the recorded deeds, the plat had nevertheless not been "properly certified, acknowledged, approved, and recorded or filed in accordance with the Plat Act," in violation of the TIF Act. See 65 ILCS 5/11-74.4-3(v) (West 2006); 765 ILCS 205/1 (West 2006).

The defendants counter that the relevant subdivisions were never subject to the subdivision requirements of the Plat Act because the Plat Act provides an exception for "[t]he division or subdivision of land into parcels or tracts of 5 acres or more in size which does not involve any new streets or easements of access" (765 ILCS 205/1(b)(1) (West

34

2006)).  The defendants argue that this exception applied to each of the four subdivisions that occurred between 1950 and 1990, which were subdivisions into "tracts of 5 acres or more" and did not "involve any new streets or easements of access."

The Plat Act provides, in pertinent part, as follows:

"(a) Except as otherwise provided in subparagraph (b) of this Section, whenever the owner of land subdivides it into 2 or more parts, any of which is less than 5 acres, he must have it surveyed and a subdivision plat thereof made by an Illinois Registered Land Surveyor, which plat must particularly describe and set forth all public streets, alleys, [and] ways for public service facilities ***.  ***

***

(b) Except as provided in subsection (c) of this Section, the provisions of this Act do not apply and no subdivision plat is required in any of the following instances:

1.  The division or subdivision of land into parcels or tracts of 5 acres or more in size which does not involve any new streets or easements of access[.]"  765 ILCS 205/1(a), (b)(1) (West 2006).

We agree with the defendants that the Plat Act does not apply to the relevant divisions of land that occurred between 1950 and 1990 because the divisions involved parcels of five acres or more in size; thus, the land was not "subject to the subdivision requirements of the Plat Act."  See 65 ILCS 5/11-74.4-3(v) (West 2006); 765 ILCS 205/1 (West 2006).  We further agree with the circuit court's conclusion that, having qualified as subdivided pursuant to the deeds recorded between 1950 and 1990, the property need not also qualify under the second method of subdivision described in the section.  See 65 ILCS 5/11-74.4-3(v) (West 2006).

The plaintiff next contends that if the Plat Act does not apply, the land was under common control and use when the TIF District was formed, "negating any 'subdivision' of

35

the land by intrafamily deeds dating back to 1937."

While we recognize that the evidence might have supported an inference that the land was under the common control and use of the Biebel/Moore family when the TIF District was formed, "[t]he plain meaning of the language used [in a statute] is always the safest guide to follow in construing any act[,] and the courts have no right to read into a statute words not found therein either by express inclusion or by fair implication" (*Hagen*, 18 Ill. 2d at 179). The TIF Act does not describe subdivision in terms of "use" or "control." The TIF Act instead deems land as subdivided when "the parcel was part of a larger tract that had been divided into 3 or more smaller tracts that were accepted for recording during the period from 1950 to 1990." The land clearly meets the criteria under the TIF Act to be considered subdivided and therefore vacant.

*Mine Impaired Sound Growth of Redevelopment Area*

The plaintiff argues that the property could have developed residentially and that the northern half of it did, in fact, develop residentially. The plaintiff argues that, considering that most of Belleville and other municipalities in St. Clair County are undermined, commercial and noncommercial structures alike, mine remediation is rare and not necessary for development. Thus, the plaintiff argues that the mine did not impair the sound growth of the redevelopment area

The City found that the abandoned mine impaired the growth of the redevelopment area. The circuit court concluded that the City did not abuse its discretion when it found that the sound growth of the TIF District area had been impaired by the mine. The circuit court noted that this corner, which had been undermined, was the only one of four that had not developed, that there had never been any serious interest in development, and that even with governmental assistance, only one group responded to the City's request for development proposals. Thus, the circuit court concluded, "Without municipal assistance using TIF, [the

36

Business District Division,] and [economic incentive agreement] assistance[,] this property would never have developed."

The City's and the circuit court's findings were supported by the evidence adduced at the trial. For example, Midwest Testing's study indicated that the mine had a moderate risk of subsidence; Johnson, the plaintiff's expert, testified that, considering the moderate risk of subsidence, he would have advised his commercial client not to build on the site; and Bornstein testified that both Walmart and Lowe's viewed the mine as an impairment which required remediation. The evidence clearly supported the City's conclusion that the mine impaired the sound growth of the redevelopment area. The City and the consultants were aware of mine subsidence events near the subject property–including an event north of the subject property over the same mine. Likewise, the circuit court correctly concluded that the 100-year-old mine, which had been unused since the 1940s, impaired the sound growth of the redevelopment project area. As a result, we cannot conclude that the circuit court's findings were against the manifest weight of the evidence.

*The TIF Act's "But For" Test*

The plaintiff contends that the redevelopment project area on the whole was subject to growth and development through private investment because the area consisted of a working and profitable farm in which Amann invested heavily year after year. To the contrary, the defendants argue that the redevelopment area on the whole had not been subject to growth and development through investment by private enterprise, as shown by its failure to develop and the lack of inquiry or building permits requested for the property.

Section 11-74.4-3(n)(J)(1) of the TIF Act provides as follows:

"No redevelopment plan shall be adopted unless a municipality complies with all of the following requirements:

(1) The municipality finds that the redevelopment project area on the

37

whole has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan." 65 ILCS 5/11-74.4-3(n)(J)(1) (West 2006).

In the Redevelopment Plan, the City, through EDR, concluded that the redevelopment project area, on the whole, had not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to attract new development without the adoption of the Redevelopment Plan. The City concluded that the area "is characterized by both disinvestment and neglect," that "all structures are vacant, obsolescent, deteriorated, and below minimum code," and that "[r]einvestment within the area [had] been limited for many decades." The City further concluded that the public infrastructure, including public rights-of-way, was inadequate due to functional obsolescence and that significant portions of the area consisted of abandoned coal mines. In the Redevelopment Plan, the City concluded, "Given the lack of investment within the Area, the $19.8 million budgeted to implement the mine remediation, infrastructure improvements, storm water management, and other TIF eligible expenditures, it is clear that 'but for' the use of tax increment financing the Area will not be redeveloped." The City concluded, "Both the public and private activities anticipated within the Area will be unable to occur 'but for' assistance from tax increment financing."

As mentioned previously, the City's findings are entitled to a presumption of validity. See *Geisler*, 383 Ill. App. 3d at 850. The plaintiff had the burden to overcome this presumption by clear and convincing evidence. See *Geisler*, 383 Ill. App. 3d at 850. We will not set aside the circuit court's finding that the plaintiff did not meet his burden, unless the circuit court's decision is contrary to the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850.

38

Although the plaintiff argues that the project area was growing and developing as a farm leased by Amann, we find that in construing the plain language of the TIF Act, "growth and development through investment by private enterprise" and the "anticipat[ion] [of] develop[ment]" necessarily contemplates buildings or improvements that increase the value and tax basis of the property. See *Board of Education of Community High School District No. 218 v. Village of Robbins*, 327 Ill. App. 3d 599, 610 (2001) (the trial court concluded that the term "growth" in section 11-74.4-3 of the TIF Act " 'necessarily contemplates new buildings or improvements that increase the value and the tax basis of the property' "). While we recognize that farming is an important basic component of the economy, we must give effect to the plain language of a legislative enactment, even though the consequences may be harsh, unjust, absurd, or unwise. See *Masterson*, 188 Ill. 2d at 557. " 'Such consequences can be avoided only by a change of the law, not by judicial construction \*\*\*.' " *Masterson*, 188 Ill. 2d at 557 (quoting *People ex rel. Pauling v. Misevic*, 32 Ill. 2d 11, 15 (1964)).

In the present case, there had been no commercial development on the property for decades, and Mayor Eckert and Malloy testified that there had been no developer interest in the property. In 2006, the City issued a request for proposals for development of the property and received only one response, the Developers', whose interest was conditioned on the assistance identified in the Redevelopment Plan. Indeed, the plaintiff was unable to produce evidence of any potential investors, other than the Developers, who intended to invest in the growth and development of the site. See *Board of Education of Community High School District No. 218*, 327 Ill. App. 3d at 614. The evidence at the trial demonstrated that the Developers, Walmart, and Lowe's all expressed a concern and need for the remediation of the mine. A portion of the Little Oak mine had subsided only hundreds of yards to the north, and the value of property where subsidence had occurred decreased. The development in the immediate vicinity of the property, except for the YMCA, occurred over

39

areas that had not been undermined. The evidence supported the conclusion that the property, with an unremediated underground mine with a moderate risk of subsidence, had failed to develop because of the underground mine and the risks it presented.

The plaintiff also contends that the area could have developed residentially, in spite of the abandoned underground mine. We agree with the defendants' counter, however, that the qualities that made the corner desirable for commercial development (the proximity to a major intersection and visibility) made it undesirable for residential development. The other three corners of the intersection included a college, a church, and a gas station and were not residential uses.

Based upon the evidence presented during the trial, the plaintiff failed to establish by clear and convincing evidence that the City abused its discretion when it concluded that the redevelopment project area was not subject to growth and development through private enterprise and that the area would not reasonably be anticipated to be developed without the adoption of the Redevelopment Plan. Accordingly, we hold that the circuit court's finding was not against the manifest weight of the evidence. See *Geisler*, 383 Ill. App. 3d at 850.

Business District Division

*Blight*

The plaintiff argues that the City's findings with respect to blighting conditions in the farm fields that compose 95% of the Business District were improper because the City referenced future uses as a commercial development and not the land's then-present agriculture use. See *Geisler*, 383 Ill. App. 3d at 850 (a municipality may not consider an area blighted under the Business District Division based on its assessment of the area's suitability for future development).

The corporate authorities of a municipality may designate, after public hearings, an area of the municipality as a Business District. 65 ILCS 5/11-74.3-2(a) (West 2006). "If the

40

corporate authorities of a municipality desire to impose a tax by ordinance pursuant to subsection (12) or (13) of Section 11-74.3-3, the following additional procedures shall apply to the designation of the business district and the approval of the business district development or redevelopment plan:

* * *

(3) The corporate authorities of the municipality shall make a formal finding of the following: (i) the business district is a blighted area that, by reason of the predominance of defective or inadequate street layout, unsanitary or unsafe conditions, deterioration of site improvements, improper subdivision or obsolete platting, or the existence of conditions which endanger life or property by fire or other causes, or any combination of those factors, retards the provision of housing accommodations or constitutes an economic or social liability or a menace to the public health, safety, morals, or welfare in its present condition and use; and (ii) the business district on the whole has not been subject to growth and development through investment by private enterprises or would not reasonably be anticipated to be developed or redeveloped without the adoption of the business district development or redevelopment plan."  65 ILCS 5/11-74.3-5(3) (West 2006).

Thus, the Illinois Municipal Code sets out two requirements before a Business District may impose a sales tax under the TIF Act: the Business District Division blight test and the "but for" test.

Pursuant to Ordinance 6818, the City created the Business District, approved the Business District Plan, and imposed a special sales tax within the area.  The Business District is that part of the TIF District which was not developed residentially (approximately 60 to 70 acres of the 150-acre overall redevelopment project area).

In the Business District Plan, the City concluded that "virtually the entire District is

41

subject to mine subsidence, a condition that is unsafe and endangers the property itself." In the Business District Plan, the City also found "unsafe conditions at the intersection of Green Mount Road and Carlyle Avenue" because "the Level of Service 'F' identified in the traffic impact study connotes traffic congestion which [had] reached unsafe levels during the P.M. peak hours."

The City adopted the findings of blight in the Business District Plan and concluded as follows:

"The Business District is a blighted area; that, by reason of the predominance of defective or inadequate street layout, unsanitary or unsafe conditions, deterioration of site improvements, or the existence of conditions which endanger life or property by fire or other causes, or any combination of those factors, constitutes an economic or social liability or a menace to the public health, safety, morals, or welfare in its present condition and use."

Because the findings of blight in the Business District were approved by city ordinance, a presumption exists that the City's findings of blight are valid. See *Geisler*, 383 Ill. App. 3d at 850. Accordingly, the plaintiff had the burden to overcome this presumption by clear and convincing evidence. See *Geisler*, 383 Ill. App. 3d at 850. "On appeal, the circuit court's finding that the plaintiff[] did not meet [his] burden will not be set aside unless clearly contrary to the manifest weight of the evidence." *Geisler*, 383 Ill. App. 3d at 850.

The evidence at the trial supported the City's conclusions: the street layout was inadequate and represented an impediment to development within the district; the five structures, the underground mine, and the traffic service were unsafe and endangered the property itself; the major defects of the five structures demonstrated the deterioration of site improvements; and the underground mine and the potential for subsidence, along with the traffic service and the dilapidated structures, endangered life or property by fire or other

42

causes. The predominance of the combination of these factors constituted an economic liability in the land's then-present condition and use. See 65 ILCS 5/11-74.3-5(3)(i) (West 2006). We reject the plaintiff's contention that the City premised its findings of blight on the proposed future use of the land, as disapproved of in *Geisler*, 383 Ill. App. 3d at 836. Here, the City's findings relate to the land's then-present condition and use.

The plaintiff concedes that the old farmstead of the Business District included blighting conditions. The plaintiff maintains, however, that these conditions were limited to a small corner of the farmstead and were not "predominant" throughout the entire 80 acres.

The language of the Illinois Municipal Code provides that a combination of factors, *i.e.*, defective or inadequate street layout, unsanitary or unsafe conditions, deterioration of site improvements, and the existence of conditions which endanger life or property, must be predominant to constitute an economic liability in its present condition and use. See 65 ILCS 5/11-74.3-5(3)(i) (West 2006). The conditions limited to the farmstead acted in combination with the other factors, including the inadequate street layout and the existence of the underground mine with a moderate risk of subsidence, the predominance of which constituted an economic liability in the land's present condition and use. See 65 ILCS 5/11-74.3-5(3)(i) (West 2006).

*Business District's "But For" Test*

The plaintiff argues that the Business District fails the "but for" test because it, as a whole, was subject to growth and development through investment by private enterprises, as evidenced by Amann's private investment in the land over the past 50 years and the resulting thriving farming enterprise.

Pursuant to the "but for" test in the Illinois Municipal Code, the City made a formal finding that "the business district on the whole has not been subject to growth and development through investment by private enterprises or would not reasonably be

43

anticipated to be developed or redeveloped without the adoption of the business district development or redevelopment plan." See 65 ILCS 5/11-74.3-5(3) (West 2006).

As explained previously with regard to the TIF Act's "but for" provision, the evidence at the trial demonstrated the lack of developer interest in the property and the property's failure to develop because of the underground mine and the risks it presented. The evidence supported the City's conclusion that the redevelopment project area had not been subject to growth and development through investment by private enterprises or would not reasonably be anticipated to be developed or redeveloped without the adoption of the Business District development or redevelopment plan. See 65 ILCS 5/11-74.3-5(3) (West 2006).

The Economic Incentive Agreement

The plaintiff argues that the circuit court erred when it determined that the City did not violate section 8-11-20 of the Illinois Municipal Code (65 ILCS 5/8-11-20 (West 2006)) when it entered into the economic incentive agreement with the Developers. The plaintiff argues that the City's finding in Ordinance 6819 (Belleville, Ill., Ordinance No. 6819 (eff. January 11, 2006)) that the property was "vacant" was improper and was contradicted by EDR's report, which stated that a part of the land was vacant and a part of it was not. Because this issue involves statutory interpretation and there is no question of fact to be resolved, we review this issue *de novo*. See *Geisler*, 383 Ill. App. 3d at 839.

Municipalities may authorize the expenditure of public funds "as may be necessary for the planning, execution[,] and implementation of the business district plans." 65 ILCS 5/11-74.3-3(9) (West 2006). "However, if the expenditure of public funds will involve an agreement to share retailer occupation taxes collected by the City pursuant to section 6z-18 of the State Finance Act, the findings set forth in section 8-11-20 of the Illinois Municipal Code are required." *Geisler*, 383 Ill. App. 3d at 847.

Pursuant to section 8-11-20, the Illinois Municipal Code authorizes the corporate

44

authorities of a municipality to enter into economic incentive agreements for the development or redevelopment of land within the corporate limits of the municipality. 65 ILCS 5/8-11-20 (West 2006). "Under this agreement, the municipality may agree to share or rebate a portion of any retailers' occupation taxes received by the municipality that were generated by the development or redevelopment over a finite period of time." 65 ILCS 5/8-11-20 (West 2006). Before entering into such an agreement, the corporate authorities must make up to nine required findings. 65 ILCS 5/8-11-20 (West 2006). As noted by the defendants, the plaintiff's challenges to the City's findings are limited to subsections (1) and (2) of section 8-11-20 (65 ILCS 5/8-11-20(1), (2) (West 2006)). Subsections (1) and (2) provide as follows:

"(1) If the property subject to the agreement is vacant:

(A) that the property has remained vacant for at least one year, or

(B) that any building located on the property was demolished within the last year and that the building would have qualified under finding (2) of this Section;

(2) If the property subject to the agreement is currently developed:

(A) that the buildings on the property no longer comply with current building codes, or

(B) that the buildings on the property have remained less than significantly unoccupied or underutilized for a period of at least one year[.]" 65 ILCS 5/8-11-20(1), (2) (West 2006).

In Ordinance 6819 (Belleville, Ill., Ordinance No. 6819 (eff. January 11, 2006)), the City found "[t]hat the Project Area is vacant and has remained vacant for a period of at least one year." Attached as exhibit B to Ordinance 6819 was EDR's October 2005 findings, which also indicated that the property was vacant and had remained vacant for at least one

45

year. EDR's findings further indicated the following:

"For that portion of the Project's area that is currently developed:

(A) The buildings on the property no longer comply with current building codes.

Field investigations by EDR and the City in 2005 have shown that the five structures on the developed parcel (parcel *** 005) do not comply with current building codes.

(B) The buildings on the property have remained less than significantly occupied or underutilized for a period of at least one year.

Field investigations by EDR, and discussions with the City, in 2005 have shown that all the buildings on the parcel have remained unoccupied for a period of at least one year."

"Vacant" is not explicitly defined in section 8-11-20 of the Illinois Municipal Code, but the language clearly characterizes "vacant" property as property without buildings and "developed" property as property with buildings. See 65 ILCS 5/8-11-20(1), (2) (West 2006). In the present case, pursuant to subsection (1), the City, through EDR, held that the property had remained vacant for at least one year. Pursuant to subsection (2), the City, through EDR, further held that the buildings on the property no longer complied with current building codes and had remained less than significantly occupied or underutilized for a period of at least one year. By including EDR's specific findings with regard to both vacant and developed portions of the property into Ordinance 6819, the City sought to satisfy both sections.

Nevertheless, because the area subject to the redevelopment agreement included buildings, it was deemed by the plain language of the Illinois Municipal Code to be "developed." Because the property subject to the agreement was considered "developed"

46

pursuant to the Illinois Municipal Code, the City properly evaluated whether the buildings on the property "compl[ied] with current building codes" or whether the buildings on the property "remained less than significantly unoccupied or underutilized for a prior of at least one year (65 ILCS 5/8-11-20(2) (West 2006)). It is undisputed that the evidence at the trial supported the City's findings in this regard. Accordingly, we find no error.

*Main Street Streetscape Program Contribution*

The plaintiff asserts that the payment to the City of $250,000 characterized as the "Main Street Streetscape Program" is an "advance" of funds. The plaintiff argues, as Bornstein testified and as is further shown by the summary report, this $250,000 payment is specifically listed as an "eligible cost" intended to be reimbursed to the Developers and Walmart. The plaintiff argues that this payment to the City is nothing more and nothing less than a signing bonus, which is not allowed pursuant to the TIF Act, the Business District Division, or section 8-11-20 of the Illinois Municipal Code. The plaintiff argues that this illegal payment voids the Redevelopment Agreement.

The defendants argue that the Developers' $250,000 donation to the City was a contribution for the welfare of the community, not a "signing bonus." The defendants argue that the Developers never sought a reimbursement for their contribution and that the plaintiff's reference to the total budget, which included the $250,000 contribution among some $34 million in budget costs, is misplaced because many of the line-item costs listed (*i.e.*, paving, parking lot, and lighting) would not be reimbursable pursuant to the Redevelopment Agreement. The defendants argue that the evidence only showed that the payment was made, that it was a line item in the Developers' budgets, and that the Developers advanced a number of reimbursable project costs. The defendants argue that there was no evidence indicating that the City asked for the payment, that there was any competition for the shopping center redevelopment project (such that a "signing bonus"

47

might be considered unfair), or that the payment was consideration for the Redevelopment Agreement.

" 'There can be no question that a contract based upon an illegal or immoral consideration is unenforceable and that a contract to perform services which would tend necessarily to improperly influence action as to public contracts or the administration of justice is also unenforceable.' " *Buckley v. Coyne Electrical School, Inc.*, 343 Ill. App. 420, 428 (1951) (quoting *Lewy v. Standard Plunger Elevator Co.*, 296 Ill. 295, 300 (1921)). However, we agree with the defendants and find no supporting evidence that the $250,000 contribution was a "signing bonus." The contribution to the Streetscape Program would not qualify as a reimbursable cost under the TIF Act or under the Redevelopment Agreement, and the evidence did not support the conclusion that the contribution was intended to be a reimbursable cost or that it was reimbursed to the Developers. Accordingly, we reject the plaintiff's suggestion to void the Redevelopment Agreement on that basis.

CONCLUSION

The dissent characterizes the governmental action in this case as a "deal" derived from "special legislation." Despite the dissent's disapproval of the relevant provisions of the Illinois Municipal Code, we must give effect to the plain language of a legislative enactment. When considering that language, along with the presumption of ordinance validity and the standard of review, we cannot conclude that the circuit court's findings were against the manifest weight of the evidence.

For the foregoing reasons, the order of the circuit court of St. Clair County is affirmed.


Affirmed.


48

JUSTICE SPOMER, dissenting:

I respectfully dissent. The result of the governmental action in this case is to take profitable farmland and declare it to be vacant and blighted in order to facilitate a deal whereby a developer can be reimbursed with millions of dollars of public taxpayer funds for the costs associated with the commercial development of that property. For the reasons that follow, I believe that the tax-increment financing (TIF), Business District, and economic incentive agreement ordinances enacted by the City of Belleville in this case fail to conform to the requirements of the applicable sections of the Illinois Municipal Code and should be invalidated.

## 1. TIF Ordinance

The TIF redevelopment project area (TIF district) is composed of 150 acres, 143 of which were profitable, producing farmland at the time of the creation of the TIF district. In order to create a TIF district under the Tax Increment Allocation Redevelopment Act (TIF Act) (65 ILCS 5/11-74.4-1 *et seq.* (West 2006)), a municipality must, *inter alia*, make a determination that the land it wishes to include in the TIF district is a blighted area within the meaning of the TIF Act. 65 ILCS 5/11-74.4-3(p) (West 2006). The TIF Act sets forth different tests for determining whether land is "blighted," depending on whether the land is considered "vacant" or "improved" within the meaning of the TIF Act. 65 ILCS 5/11-74.4-3(a) (West 2006).

At the time the TIF Act was enacted, farmland in agricultural production was specifically exempted from the definition of the term "vacant" in the TIF Act. 1961 Ill. Laws ___. Two subsequent amendments to the definition of "vacant" in the TIF Act have allowed for farmland that has been "subdivided" to qualify as "vacant" so that, if it also qualifies as "blighted," as that term is defined in relation to vacant land in the TIF Act, it can become part of a TIF district. 65 ILCS 5/11-74.4-3(v) (West 2006). My search of the legislative history

49

of these amendments in an effort to ascertain the reasoning behind carving out an exception for subdivided farmland reveals that the amendments were nothing short of special legislation designed to validate specific pork barrel TIF projects in Illinois. See, *e.g.*, 88th Ill. Gen. Assem., Senate Proceedings, January 13, 1994, at 44 (statements of Senator Weaver) (explaining that an amendment to the definition of "vacant land" in the TIF Act "validates some annexations to a TIF district in Tuscola"). Nevertheless, the amendments exist and because the farmland at issue was "a larger tract that has been divided into 3 or more smaller tracts that were accepted for recording during the period from 1950 to 1990," the 143 acres are deemed to have been subdivided and can be subject to a blight analysis as vacant property under the TIF Act. 65 ILCS 5/11-74.4-3(v) (West 2006).

Having found that the land meets the statutory definition of "vacant," Belleville found the area to be blighted because it found that the sound growth of the redevelopment project area is impaired by the fact that the area consists of one or more unused quarries, mines, or strip mine ponds. See 65 ILCS 5/11-74.4-3(a)(3) (West 2006). I would find that the plaintiff rebutted the presumption of the validity of that finding by clear and convincing evidence. The sound growth of this area was not impaired by the mine because the mine did not interfere with the land's ability to be used as a productive and profitable farm. Harold Amann, a farmer whose family had leased and farmed the subject property for 50 years, testified that although mine subsidence had interfered with his ability to farm other parcels of land, there had never been subsidence conditions on the subject property and the mine did not interfere with his ability to farm the subject land profitably. Interestingly, the mine did not interfere with the residential development of the property, as a residential subdivision was built over the northern portion of the TIF district, which is also undermined. Although Belleville claims that its planning documents contemplate this area for commercial development, this court has held that the requirement that the development of a project area

50

under the TIF Act be impaired does not mention, and does not contemplate, the anticipated growth necessarily being in conformity with the city's comprehensive plan for development. *Castel Properties, Ltd. v. City of Marion*, 259 Ill. App. 3d 432, 442 (1994). Given the extensive evidence in the record that growth and development were occurring in the vast undermined areas surrounding the subject property and given the residential development that was occurring in the immediate vicinity, which is also undermined, I would find that the circuit court's approval of the TIF ordinance at issue was against the manifest weight of the evidence.

## 2. Business District

The Business District is the southern half of the TIF district, totaling approximately 70 acres. All of this 70 acres, except 2.5 acres where the farm buildings are located, and the intersection of Green Mount Road and Carlyle Avenue, consisted of producing farmland at the time the area was declared a business district. In order to declare this area a business district, Belleville was required to find that the predominance of various conditions on the property "retards the provision of housing accommodations or constitutes an economic or social liability or a menace to the public health, safety, morals, or welfare *in its present condition and use*." (Emphasis added.) 65 ILCS 5/11-74.3-5(3) (West 2006). According to Belleville and the developer, this standard is met due to traffic safety concerns at the intersection, dilapidation and dumping on the 2.5 acres where the farm buildings are located, and the existence of the mine. The traffic concerns at the intersection and the dilapidation of the buildings and dumping on the 2.5 acres simply do not predominate the 70 acres that compose the business district. While the mine does predominate the 70 acres, it does not retard the provision of housing accommodations because the evidence shows that the 83 acres of the TIF district that developed residentially were developed despite the existence of the mine and without any remediation of the mine. Neither did the mine constitute an

51

economic or social liability or a menace to the public health, safety, morals, or welfare in the condition and use of that portion of the business district that is undermined, because it was producing farmland and the evidence showed that the underground mine did not interfere with the use of the property as farmland. For these reasons, the plaintiff rebutted the presumption of validity of the business district ordinance by clear and convincing evidence, and the circuit court's finding to the contrary was against the manifest weight of the evidence.

### 3. Economic Incentive Agreement

The economic incentive agreement (EIA) covers the entire area of the TIF district. In order to have a valid EIA, the municipality must make specific findings based on whether the property is vacant or improved. 65 ILCS 5/8-11-20 (West 2006). As described above, only 2.5 acres of the TIF district and the intersection of Green Mount Road and Carlyle Avenue were improved at the time the ordinances were enacted. The remaining 143 acres were producing and profitable farmland at that time. The EIA ordinance found this land to be vacant. However, in contrast to the TIF Act, where "vacant" is specifically defined, "vacant" is not defined for purposes of the section of the Illinois Municipal Code that authorizes EIAs, and we must therefore look to its plain and ordinary meaning. See *People v. Ward*, 215 Ill. 2d 317, 325 (2005). It is appropriate to refer to a dictionary for this purpose. See *People v. Beachem*, 229 Ill. 2d 237, 244-45 (2008). In Merriam-Webster's Collegiate Dictionary, "vacant" has a specific meaning in the context of land, which is "not put to use." Merriam-Webster's Collegiate-Dictionary 1380 (11th ed. 2006). Pursuant to this definition, the 143 acres of profitable and producing farmland were not vacant or improved at the time the EIA ordinance was enacted. Unlike the TIF Act, no special legislation has been enacted to allow for profitable and producing farmland to be subject to an EIA. Because the overwhelming majority of the project area cannot qualify as an EIA, I would find that the plaintiff met his burden of challenging the ordinance by clear and convincing

52

evidence, and the circuit court's order upholding the ordinance is against the manifest weight of the evidence.

## CONCLUSION

For the foregoing reasons, I find the TIF, Business District, and EIA ordinances enacted by the City of Belleville in this case to violate the letter and the spirit of the respective provisions of the Illinois Municipal Code. I would reverse the judgment of the circuit court of St. Clair County and would remand with directions that a judgment be entered in favor of the plaintiff, invalidating all three municipal ordinances at issue in this case.

NO. 5-09-0533

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| STEPHEN T. MALEC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 06-MR-45 |
| | ) | |
| THE CITY OF BELLEVILLE, ILLINOIS, an Illinois | ) | |
| Municipal Corporation, THF GREEN MOUNT | ) | |
| DEVELOPMENT, LLC, a Missouri Limited | ) | |
| Liability Company, and GMCR, LLC, a Missouri | ) | |
| Limited Liability Company, | ) | Honorable |
| | ) | Lloyd A. Cueto, |
| Defendants-Appellees. | ) | Judge, presiding. |

**Opinion Filed**:   February 7, 2011

**Justices**:   Honorable James M. Wexstten, J.

Honorable Melissa A. Chapman, P.J.
Concurred

Honorable Stephen L. Spomer, J.
Dissented

**Attorneys for Appellant**   John M. Myers, Nick San Diego, Rabin, Myers & Hanken, P.C., 1300 South Eighth Street, Springfield, IL 62703; Penni S. Livingston, Livingston Law Firm, 5701 Perrin Road, Fairview Heights, IL 62208

**Attorneys for Appellees**   Robert J. Sprague, Sprague and Urban, 26 East Washington Street, Belleville, IL 62220 (attorney for City of Belleville)

Bradley A. Winters, Sonnenschein, Nath & Rosenthal, LLP, One Metropolitan Square, Suite 3000, St. Louis, MO 63102 (attorney for GMCR, LLC, and THF Green Mount Development, LLC)